*In re* EDWARD T. *et al.*, Minors, Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee, v. Edward T., Respondent-Appellant).

First District (1st Division)    No. 1—02—2664

Opinion filed September 15, 2003.

Donna L. Ryder, of Law Office of Donna Ryder, Ltd., of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Nancy Grauer Kisicki, and James D. Ridgway, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Respondent, Edward T., appeals from the circuit court's orders finding his two children neglected due to an injurious environment and finding him unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the children. Respondent contends that the trial court's finding of neglect was against the manifest weight of the evidence and that the court abused its discretion in not granting him custody of the minors. For the following reasons, we affirm.

## BACKGROUND

Respondent is the biological father of the two children involved in this cause of action: Edward T. (hereinafter referred to as Eddie), born September 9, 1997, and Ariel T., born January 27, 2000. Latrena S.,[1] the biological mother of the two children, gave birth to a third child,

---

[1]On June 16, 2003, this court granted the Cook County public defender's motion to withdraw from the mother's appeal pursuant to *Pennsylvania v. Finley*, 481 U.S. 551, 95 L. Ed. 2d 539, 107 S. Ct. 1990 (1987). *In re A.T.*, No. 1—02—2668 (June 16, 2003) (unpublished opinion under Supreme Court Rule 23).

Cassio G., on October 18, 2000. Brian G. is the biological father of Cassio. Cassio was born eight weeks premature and was hospitalized until November 21, 2000.

On August 24, 2001, Latrena took all three children to Illinois Masonic Hospital for a doctor's appointment. Hospital records indicate that Ariel was 17 months old at the time and had not received all of her recommended immunizations. She was also diagnosed with a speech delay. Cassio, 10 months, had not received the three sets of immunizations he should have received by six months of age and was diagnosed with a failure to thrive due to his below normal weight of 6,340 grams (in his brief, respondent converts this weight to 13.9 pounds). The records also revealed that Cassio had a "severe" developmental delay as he had not yet begun to sit up or crawl. Cassio was admitted to the hospital for treatment and Eddie and Ariel were taken into the custody of the Department of Children and Family Services (DCFS) on August 30, 2001. On September 4, 2001, the State filed a petition for adjudication of wardship. On the same day, temporary custody orders were entered for Eddie and Ariel, which stated that "probable cause does exist the minor is abused/neglected/dependant," and found their removal from their home was an immediate necessity. The orders were entered with prejudice as to respondent, a noncustodial parent, based on his stipulation to the facts alleged in the State's petition. The petition stated that Ariel's and Cassio's immunizations were not current, Ariel was developmentally delayed, Cassio was diagnosed with nonorganic failure to thrive and Latrena was not addressing Ariel's and Cassio's medical needs.

An adjudication hearing was commenced on February 26, 2002, and continued to April 18, 2002, and May 17, 2002. At the hearing, Dr. Silviano Gomez testified that he received his medical degree from the University of Salamanca in Spain in 1967. He subsequently completed an internship at Illinois Masonic Medical Center, a residency in pediatrics and a fellowship in ambulatory pediatrics. He served as a staff physician in pediatric and ambulatory care at Illinois Masonic and as an assistant professor in pediatric medicine at the University of Illinois. The court qualified Dr. Gomez as an expert in pediatric medicine.

Dr. Gomez testified that he treated Cassio in the hospital from August 24 to September 14, 2001. When Cassio arrived at the hospital, he weighed between 13 and 14 pounds, which was below the fifth percentile for a 10-month-old child. In addition, he had not received any immunizations and could not sit up, a six-month milestone, or crawl, a nine-month milestone. Dr. Gomez and Cassio's nurse practitioner, Catherine Tomaka, agreed that Cassio needed to be admitted to the hospital for treatment of his failure to thrive.

Dr. Gomez testified that a failure to thrive is diagnosed by a child's weight. A failure to thrive is considered nonorganic, and generally the result of neglect, where the child gains around two ounces a day during hospitalization and his blood, lead, urine and neurological tests are normal. An organic failure to thrive on the other hand is the result of a disease such as anemia, tubular acidosis, lead poisoning or dehydration. Dr. Gomez stated that Cassio's tests were normal and, during his first week of hospitalization, he gained about one pound. As a result, Dr. Gomez diagnosed him with nonorganic failure to thrive due to inadequate nutrition. Although Cassio was premature, Dr. Gomez stated that a premature child will generally be within the normal weight limits by six months of age.

On cross-examination, Dr. Gomez agreed that the Nelson Textbook of Pediatrics is a reliable authority on pediatrics, and admitted it provided that a "corrected age" should be used when measuring the growth of a premature infant until he/she reaches the "corrected age" of one to two years. He further testified he could not state how many grams Cassio gained in the hospital because he could not convert pounds to grams in his head. Dr. Gomez was unable to testify as to Cassio's date of admission without referring to the hospital records and did not know Cassio's rate of weight gain prior to being admitted because he was not the child's primary physician. When diagnosing Cassio, Dr. Gomez did not take into account Cassio's cultural background or diet and did not conduct any endocrinology tests, which would show whether the failure to thrive was due to a gland problem. He believed, however, that Cassio's ability to gain weight on a proper diet ruled out such a problem.

John Gac testified that he is a child protection investigator with DCFS. Gac received Eddie's, Ariel's and Cassio's cases on August 28, 2001, one day after a report was made to DCFS for medical neglect and failure to thrive. Gac stated he spoke with Latrena at the hospital. She told him she did not believe there was anything wrong with Cassio and that he had, in fact, gained a significant amount of weight over the past two months. She further stated that she was a trained nurse's assistant and that her opinion regarding her son was just as valid as the doctor's. According to Gac, Latrena admitted that Ariel's immunizations were not current and that, like Cassio, Ariel had been unable to sit up at 10 months.

Latrena explained to Gac that she worked full-time. She awoke at 4:30 a.m. to give Cassio a bottle of milk. She also prepared cereal for her brother to give him later, as her brother cared for the children while she was at work. When Latrena returned from work, she would give Cassio another bottle and later feed him. Gac visited Latrena's

apartment and met her brother. He did not see any baby food in the home and, when he asked where the baby food was kept, Latrena's brother was unable to find any. Gac saw the children during his visit to the apartment and he stated they "showed no emotion whatsoever." However, he did not see any signs of abuse or neglect.

Gac instructed Latrena to take Eddie and Ariel to the doctor to be evaluated. On August 29, 2001, Latrena called Gac to tell him she could not take the children to the doctor because she could not get an appointment until the following day. She also told Gac that she would no longer have her brother care for the children while she was at work. On August 30, 2001, Gac placed the children in protective custody due to Cassio's diagnosis of nonorganic failure to thrive and the risk of neglect to Eddie and Ariel due to their young age.

Marjorie Kaplan testified that she is a social worker at Illinois Masonic Hospital. She met with Latrena and Brian G. on August 27, 2001. Latrena told Kaplan that Cassio was fine and she did not understand why he could not return home. Latrena also stated that she had not taken Cassio for his immunizations because she did not have a medical card. Kaplan testified that Latrena said her medical card had expired and, because she refused to provide certain information, it was not renewed for six months. Kaplan explained to Latrena that the hospital would be reporting her case to DCFS because Cassio was below the normal weight and height for a child his age, he had not received his immunizations and he was developmentally delayed. Latrena stated she did not understand why the case was being reported and repeated that Cassio was fine. Because Kaplan was concerned Latrena might remove the child from the hospital, Cassio was moved to the pediatric specialty care unit where he could be more closely observed.

Dr. Leslie Zun testified on Latrena's behalf. He stated that he obtained his medical degree from Rush Medical College and completed a residency in emergency medicine at the University of Illinois. At the time of the hearing, Dr. Zun was chairman of the department of emergency medicine at Mount Sinai Hospital. During his residency he "rotate[d] on the inpatient unit" and "dealt with many pediatric patients" in other rotations. He testified that about 25% of his patients were children and that he had experience in making hot line calls to DCFS and in filling out DCFS paperwork. Dr. Zun stated he was involved in 10 to 12 failure-to-thrive cases per year. He lectured medical students, residents, physicians and occasionally public defenders and had been a professor of emergency medicine at Chicago Medical School. Finally, Dr. Zun stated that he served on a committee at the hospital reviewing abuse and neglect cases to determine whether ap-

propriate action had been taken in each case. He concluded, however, that he was "not trained in pediatrics per se," as he did not complete a fellowship or residency in pediatrics, he was not board certified in pediatrics nor was he a member of the American Academy of Pediatrics. He also admitted that an official diagnosis of abuse or neglect could not be made by him, but must be made by a specialist. Nonetheless, the court qualified Dr. Zun as an expert in emergency medicine, abuse and neglect, and pediatrics.

Dr. Zun reviewed the medical records in the cases of Cassio, Ariel and Eddie, but stated that he had never examined the children themselves. He determined from the medical records that Cassio's and Ariel's immunizations were current, but stated on cross-examination that the medical records were inconsistent with regard to the children's immunizations. Dr. Zun concluded that Cassio's developmental delays were due to his failure to thrive. In turn, his failure to thrive was the result of a combination of conditions—esophageal reflux, a neurological impairment which prevented him from sucking, swallowing and breathing simultaneously, his premature birth, and the fact that his parents were small people by nature. Dr. Zun concluded that Cassio was not abused or neglected and that, when charted, his growth remained consistent through his first year of life, whether during his hospitalization or at home.

Respondent and Latrena also produced medical records reflecting that Ariel had received immunizations on March 29, 2000, and August 24, 2001, and that Eddie also had difficulty gaining weight as an infant, but was subsequently evaluated as a healthy infant and toddler.

The trial court found that the State had proven Cassio neglected and/or abused by a preponderance of the evidence. It concluded that the medical records established that Cassio and Ariel were late in receiving their vaccinations and that Dr. Gomez's testimony was more credible than Dr. Zun's because he was Cassio's treating physician during his hospitalization. The court further found that the State had proven neglect due to an injurious environment in Ariel's and Eddie's cases, but it dismissed a count alleging lack of medical care as to Ariel.

The dispositional hearing for the children was subsequently commenced on May 20, 2000, and continued to June 4, June 25, June 28, July 23 and August 6, 2002. Sharon Moriarity, a child welfare specialist with DCFS and the caseworker for Ariel and Eddie, testified on three separate occasions during the hearing. At the opening of the dispositional hearing, Moriarity stated that Ariel and Eddie were both placed in a nonrelative, DCFS-licensed home. There had been no incidents to report from Moriarity's visit to the foster home and there were no signs of abuse or neglect. Ariel was assessed for services in

September 2001 and began receiving speech and developmental therapy at that time. Upon her reassessment in March 2002, developmental therapy was discontinued. Eddie was also assessed for services and began play therapy with therapist Michelle Flaherty due to reported sadness and withdrawal. Upon making allegations to Flaherty that he was "whooped" by his parents, Eddie was referred to therapist Vernon Glass for a psychological evaluation. Glass reported to Moriarity in late April 2002 that Eddie said his parents "whooped" him with a belt and burned him with cigarettes. When Moriarity initially heard the allegations from Glass, she understood that only Latrena was inflicting the alleged abuse; however, Glass's report introduced at the hearing indicated the abuse was being perpetrated by both Latrena and respondent. Moriarity stated that the parents should have been told of the allegations by "the investigator," but the parents indicated to her that they were unaware of the allegations until the hearing.

Moriarity testified that respondent and Latrena were assessed for services in September 2001. At that time, they were referred to parenting classes and a parenting capacity assessment, which were both successfully completed. The parenting capacity report stated that "[u]nless there is convincing evidence to the contrary, it seems clear that the best interests of Eddie and Ariel would be served by returning them to the custody of the parents as soon as possible." Moriarity stated she did not agree with the recommendation of return home even before Eddie's recent allegations of physical abuse. Following the assessment, Latrena was referred to a therapist for individual therapy. Upon the establishment of a relationship with the therapist, both Latrena and respondent were to begin family coaching. Latrena, however, did not attend therapy sessions when she was initially referred in April. As a result, respondent was unable to begin family coaching and was referred for individual therapy sessions instead. Latrena subsequently began attending individual therapy in May 2002, and parent coaching sessions with the entire family began soon thereafter. After two or three sessions, the therapist reported to Moriarity that individual and group sessions were going well and both parents were very responsive.

Moriatiry reported that both parents had four-hour, weekly supervised visits with the children. Respondent and Latrena had each missed a couple of visits for reasons unknown to Moriatiry. She observed weekly visits between the children and parents from September to December 18, 2001. She had no concerns about any of the visits until receiving a report about a visit on May 25, 2002, following Eddie's allegations of abuse. Other than the report from the

May 25 visit, Moriarity had received no reports of unusual incidents from the agency monitoring the visits. The parents acted appropriately with the children, and the children seemed happy to see them. They all appeared to enjoy the visits and were sometimes sad at their conclusion.

Moriarity stated she would not recommend unsupervised visits and felt it was in the best interests of the children to make them wards of the court. Her recommendation was based on the recent allegations of abuse by Eddie and the family's need for services. She concluded that, assuming the allegations of abuse by respondent contained in Glass's report were not true, she had only one concern with the children being returned to him—namely, that she believed respondent was living with Latrena, who was the perpetrator of the nelgect. On cross-examination, Moriarity stated that respondent told her in February that Latrena would be moving out of his apartment. He further told her at one of the court dates that he had made potential arrangements for day care. However, Moriarity reported that the investigation into the allegations of physical abuse with regard to Eddie was still ongoing at that time and, if the allegations were found to be warranted, respondent would be in need of additional services. Moriarity added that she had requested a second psychological evaluation of Latrena after seeing her throw a can of soda at an attorney in the courthouse waiting room during the adjudication hearing.

Vernon Glass testified that he is chief executive officer and a therapist at the counseling agency Right Frame of Mind. He has a master's degree in counseling and psychology, but is not licensed in the State of Illinois. Eddie was referred to Glass's agency by DCFS for a neuropsychological assessment in February 2002. Glass met with Eddie approximately seven times, with his foster father present for two of those meetings. Glass did not review any of Eddie's medical records, nor did he talk to Latrena or respondent. He received Eddie's background information from Eddie's foster mother, Ms. Johnson. Johnson told Glass that Eddie was having nightmares, wetting his bed and soiling his clothes.

Glass reported that, during their meetings, Eddie told him that his mother and father burned him in his mouth with cigarettes. Eddie stated that the burns "would just sting a while" after the cigarette was removed. Glass also testified that Eddie told him his mother stuck pins in his nose until it started to bleed. He later stated that Eddie said both his mother and father stuck pins in his nose. Eddie did not tell Glass where or how often the abuse occurred. Glass stated that in order to prove the allegations of abuse, he took Eddie outside and lit a cigarette. When he did so, Eddie began to tremble. Glass testified that

from the time he lit the cigarette until the time he finished it, Eddie watched the cigarette. Glass felt that smoking a cigarette around the child was an effective way to test his reaction. Ultimately, Glass concluded that Eddie suffered from posttraumatic stress disorder and that he required more intensive counseling, but he did not continue to see Eddie himself. The results of Eddie's neuropsychological test were generally normal, except that he fell into the borderline category for motor behavior, visual attention and narrative memory.

Kelly Ecker testified that she is a family therapist at Family Care of Illinois. She has a master's in social work and had been employed by Family Care for approximately 10 weeks. Eddie was referred to the organization for therapy to address his depression and his separation from his parents. In January or February 2002, social worker Michelle Flaherty began seeing Eddie and, in April 2002, Ecker was assigned to his case. At the time, Eddie was four years old.

Ecker testified that she discussed the allegations of physical abuse with Eddie and with Glass. She stated that, when she met Eddie, she said, "[H]i, I'm Kelly." Eddie responded that the "last therapist was here because my parents whipped me. You're here to see this." According to Ecker, Eddie then opened his mouth and pointed inside. He then told her, "this is where my parents put their cigarettes out." Ecker met with Eddie for one hour each week. She stated that she often spoke with Johnson, Eddie's foster mother, who told her that Eddie had nightmares surrounding the visits with his parents during which he screams, "daddy please don't beat me. I will be a good boy." Johnson also told Ecker that Ariel had diarrhea that could last up to two or three days after the visits with her parents.

On May 25, 2002, Ecker went to observe a visit between Eddie and Ariel and their parents. The visits were routinely supervised by a social service agency called Passages. Due to a misunderstanding regarding the location of the visit, Ecker was late and telephoned Johnson. During the telephone conversation, Johnson told Ecker that Ms. Jackson, the Passages worker supervising the visit, had called Johnson and was upset because Latrena was yelling at Eddie. Ecker told Johnson to instruct Jackson to separate the parents and the children until she arrived. When Ecker arrived at the Passages office, Latrena and respondent were in the hallway and Eddie and Ariel were in an office with Jackson. Jackson told Ecker that after respondent and Latrena arrived for the visit, Latrena took Eddie by the shoulder and told him to sit down in a chair. Latrena then sat very close to Eddie and asked him if he knew the difference between a story and the truth. She then stated, "I did whip you, but I never burned [sic]." Jackson told Ecker that she called Johnson because she "didn't know

what to do." Upon her arrival, Ecker told respondent and Latrena that they should not speak to the children about the recent allegations, and they should only address their concerns with her or their lawyers. Ecker then observed the visit for 1 hour and 40 minutes. Although Ecker asked Jackson to help supervise the visit, she testified that Jackson persisted in reading a newspaper at a table in the corner.

Ecker testified that during the visit, Eddie appeared distressed and would stand by her every time Latrena touched Ariel. She further stated that respondent "would occasionally pinch or push [Eddie]" and Eddie would loudly tell him to stop. Respondent would either laugh or continue his behavior. At one point, Latrena saw some liquid coming from Ariel's pierced ear. She stated that it was infected and attempted to squeeze the liquid out. According to Ecker, Ariel was pulling away and looking at Ecker, but Latrena continued. Ecker intervened at that time and Latrena "responded appropriately." Ecker stated she redirected the parents on several occasions when she felt their conduct was inappropriate. At other times, the children appeared to enjoy playing with their parents. She stated the visit went "fairly well."

Three days after the visit, Ecker spoke on the phone with Johnson. Johnson reported that after the visit with his parents, Eddie sat on the couch and stared at the wall for six hours. She then told Ecker that Eddie was not playing or talking and had been soiling his clothes and hiding his soiled underwear. On May 30, 2000, Ecker met with Eddie in his foster home. Ecker testified that Eddie requested that she or Glass attend all of the visits with his parents because his mother would not hurt Ariel if they were there. He further stated he wanted to live with Johnson forever because she bought him "spiderman" and does not smoke. Ecker reported that Eddie was quiet and insecure and was upset when she left. Ecker recommended that visits between the children and their parents be suspended because they were traumatizing and because Eddie had symptoms of posttraumatic stress disorder and depression. She further recommended that Passages not supervise any more of the family's visits.

Willie Jean Jackson testified that she worked for Passages and was assigned to Eddie and Ariel's case. She observed the four-hour weekly visits between the children and their parents and was authorized to stop any inappropriate behavior. Jackson stated she never needed to intervene during a visit. The children always seemed happy to attend the visits and greeted their parents with hugs and kisses. After the visits, Eddie generally told Jackson he enjoyed himself. Jackson stated that Latrena and respondent played with the children during the visits and they usually ate lunch together.

Jackson testified that on May 25, 2002, she attended a visit between respondent, Latrena and the children. She reported that respondent greeted the children normally. When Latrena entered the room, however, she was upset and told Eddie she wanted to talk to him. Latrena asked Eddie if he knew the difference between a story and the truth. Jackson stated that Eddie began to look nervous, but Latrena told him he was not going to get into trouble, he just needed to tell the truth. She then asked him repeatedly why he told people she burned him with a cigarette. Jackson stated she became nervous and left to call Johnson to inquire about where the therapist was. Jackson was then instructed to separate the children and parents until the therapist arrived. When Ecker arrived, Latrena was by the elevator crying and Ecker went to talk to her.

Jackson stated that during the remainder of the visit, the children played. At one point, respondent was wrestling with Eddie and tickling him. Eddie told him to stop and respondent complied. As Ecker testified, Jackson stated that Latrena noticed Ariel's pierced ear was infected and squeezed some fluid out of the hole. Jackson retrieved some alcohol and tissue and Latrena cleaned Ariel's ear. Jackson stated that Ariel was "squinting a little bit," but did not cry or scream. Jackson thought the children were fine during the visit and did not know why Ecker told her to observe the visit closely after she left.

On June 25, 2002, Moriarity was again called to testify. She stated that she received a report dated June 18, 2002, from the State Central Registry, which stated that the allegations of physical abuse against Latrena and respondent were unfounded based on a lack of physical evidence. The report was admitted into evidence.

Dr. Mary Zashin testified that she is a clinical psychologist with a Ph.D. in clinical psychology from the University of Texas at Austin and is licensed in the State of Illinois. She stated that she was asked to do a parenting character assessment for Latrena, respondent and the three children. In December 2001 and January 2002, she observed the children and their parents on two separate occasions. She also met with Latrena and respondent at their homes, and reviewed the DCFS service plans and social histories. Dr. Zashin testified that the interactions between the parents and children were generally positive, but that the parents needed "coaching" to learn how to set limits with the children. She felt such coaching could be done while the children were in the parents' custody. During her meetings with Latrena and respondent, Dr. Zashin administered a psychological test called the Millon Clinical Multiaxial Inventory III, the child abuse potential inventory, and the parenting stress index. Zashin testified that both parents' test results were well within normal limits.

At the time Dr. Zashin conducted the assessment, she was aware of the allegation that Eddie was "whooped" by his parents. She later learned of the allegations of burning and pins. Dr. Zashin testified that she reviewed the therapy notes of Flaherty, Ecker, Jackson, and Glass and read the transcript of the adjucatory hearing. She expressed her opinion that Glass "violated *** some of the very important requirements for conducting an unbiased interview which is likely to elicit, especially from a small child, an accurate report of events." She felt that Glass should not have received his first information, which included the new allegations of abuse, from Eddie's foster mother as it potentially biased his interview. She further stated that she had never heard of an investigative interviewing technique which involves exposing a child to cues suggesting a trauma the interviewer believes to have occurred. She believed Glass's lighting of a cigarette in front of Eddie was suggestive. She also commented that Glass's notes contained unfounded allegations ascribed to the foster mother that Latrena and respondent were substance abusers and that respondent was not Eddie's father.

Aside from Glass's techniques, Dr. Zashin had other concerns regarding Eddie's treatment. In her opinion, it was not good clinical practice for Eddie to receive therapy from two therapists at once. She also believed it unlikely that symptoms of posttraumatic stress disorder would appear 8 to 10 months after the traumatic events took place, and that Ecker did not properly handle the visit on May 25, 2002. Ecker had never met the parents before that time, she had only met Eddie three times, she had the parents and children separated based solely on information received from the foster mother over the telephone, and she "redirected" interactions when there was no indication the parents were behaving inappropriately.

Dr. Zashin concluded that it was in the children's best interest to continue visits with their parents, as suspending visits was likely to cause Eddie more anxiety and distress. She felt that although Eddie's display of distress surrounding the visits with his parents could be attributed to the upsetting nature of the visits themselves, such behavior is also common in children who have been separated from their parents. She also thought it likely that Eddie might be angry at his parents for not preventing his removal or that he may feel divided loyalties between his parents and his foster parents. She recommended that the children be returned to one of their parents as soon as possible, and her report reflected that respondent would be a more practical choice as he had more stable employment, stronger family support and more realistic and appropriate expectations of the children.

The court admitted into evidence a June 2002 psychological evalu-

ation of Latrena by Dr. Alice Murata. In the evaluation, Dr. Murata concluded that Latrena was clinically depressed. According to Murata, Latrena indicated she would cry for a week before every court date and would "cease[ ] to function" after them. Latrena further lost her job because she was unable to leave the house some days. Murata reported that although Latrena realized she failed her children, she did not realize she needed to change her behavior nor did she recognize the importance of therapy. Murata concluded that Latrena was a bright woman who was capable of learning better parenting skills, but recommended that Latrena only see the children during family therapy while receiving services to improve her skills. According to the report, Latrena told Murata she was living with respondent and hopes to marry him.

On August 6, 2002, the trial court adjudicated Ariel and Eddie wards of the court and determined that it was in their best interests to grant guardianship to DCFS with the discretion to place the children in foster care. In its findings, the court stated that both Latrena and respondent were unable to care for the children for some reason other than financial circumstances alone. Latrena's inability to care for the children due to her depression was evidenced by her June 2002 psychological evaluation. Her problems with anger were demonstrated by her behavior at the May 25 visitation and by her throwing a can of soda at an attorney in the courtroom hallway. Although the court found that the allegations of sticking pins in Eddie's nose and burning him with cigarettes were uncorroborated, it did find that Latrena whipped Eddie given Eddie's allegations, Latrena's May 25 admission, "I did whip you, but I never burned [you]," and a report by respondent's parents that Latrena whipped Eddie with a belt. The court ordered Latrena to complete anger management classes and further parenting classes.

With regard to respondent, the court found that the evidence showed he was still living with Latrena, his behavior at the May 25 visit was inappropriate, and he did nothing to stop Latrena's confrontation with Eddie at that time. The court further stated that respondent needed to complete parenting coaching and ordered him to undergo a psychological assessment to determine his ability to parent the children and protect them from Latrena's "wrath."

On January 29, 2003, the public defender of Cook County filed a motion for leave to withdraw as appellate counsel for Latrena pursuant to *Pennsylvania v. Finley*, 481 U.S. 551, 95 L. Ed. 2d 539, 107 S. Ct. 1990 (1987). This court granted the motion to withdraw and affirmed the trial court's order as to Latrena on June 16, 2003. Respondent now separately appeals the trial court's orders, contend-

ing that the court improperly conducted the temporary custody hearing and that its findings of neglect at the adjudicatory hearing were against the manifest weight of the evidence. Respondent further contends that the trial court abused its discretion in not granting him custody of Eddie and Ariel because he participated in and completed all recommended services prior to the disposition.

## ANALYSIS

■ Respondent's contentions address three stages of the instant proceedings—the temporary custody hearing, the adjudication of neglect, and the dispositional hearing which adjudicated Eddie and Ariel wards of the court. The process of determining whether a child should be removed from his parents and made a ward of the court is prescribed by the Juvenile Court Act of 1987. 705 ILCS 405/1—1 *et seq.* (West 2002). Where a petition for adjudication of wardship is filed by the State, the Act provides that a temporary custody hearing shall be held during which the court shall determine whether there is probable cause to believe the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate the necessity of removal. 705 ILCS 405/2—10 (West 2002). Each finding must be made in writing. 705 ILCS 405/2—10 (West 2002).

Initially, we address respondent's argument that the trial court failed to conduct a proper temporary custody hearing and that, pursuant to *In re Patricia S.,* 222 Ill. App. 3d 585, 584 N.E.2d 270 (1991), the court erred in failing to determine at the hearing whether DCFS made reasonable efforts to prevent or eliminate the removal of the children from their home. Respondent adds that this error also appears on the face of the temporary custody order as the court did not state in writing the nature of the services that were offered prior to the children's removal. The State contends that this issue is moot or, in the alternative, that respondent has waived the issue by not raising it in the trial court and by failing to provide a sufficient record for appellate review. We agree with each of these contentions.

■ Generally, an appeal of findings made in a temporary custody hearing is moot where there is a subsequent adjudication of wardship supported by adequate evidence. See *In re A.D.W.,* 278 Ill. App. 3d 476, 480-81, 663 N.E.2d 58, 61 (1996). As shall be discussed below, there was adequate evidence to support the adjudication and disposition in this case. Therefore, any contention of error regarding the temporary custody hearing and written order is moot. Even if we were to agree

with respondent, as we did in *In re Patricia S.*, 222 Ill. App. 3d at 589-90, 584 N.E.2d at 273, that this court may consider these moot issues because they concern issues of great public interest or that are likely to be repeated yet evade review (a determination we are not constrained to make here), we would be unable to apply these exceptions in this case. In order to review the findings made at the temporary custody hearing, we would need to review the transcript of that hearing. However, respondent has not provided this court with a transcript of the hearing and it is his burden to file an adequate record on appeal. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92, 459 N.E.2d 958, 960 (1984).

Even more specifically, without an adequate record, we would in any event be unable to determine the applicability of the holding in *Patricia S.* to the instant case. In *Patricia S.*, this court held that the trial court was required to conduct a reasonable efforts hearing before temporary custody was granted and the trial court erred in declining to do so. However, in that case the public guardian in *Patricia S.* requested such a hearing on the record. Because respondent in this case has failed to provide this court with a transcript of the temporary custody hearing, we are unable to determine whether respondent made such a request and whether the request was denied. Since there is no other indication in the record that respondent requested a reasonable efforts hearing or that he raised an objection in the trial court regarding the alleged lack of such a finding, the issue has been waived. *In re R.M.*, 283 Ill. App. 3d 469, 472, 670 N.E.2d 827, 829 (1996).

Finally, we note that even in *Patricia S.*, this court did not order the cause remanded. Instead, it found that "a ruling now on whether, at the time of the temporary custody hearings, DCFS was making reasonable efforts to keep the minors with their mother would be pointless. *** [R]easonable efforts determinations are time specific: they address the adequacy of DCFS efforts only as of the time of the ruling. A finding now concerning reasonable efforts at the temporary custody stage would have no effect on the minors." *In re Patricia S.*, 222 Ill. App. 3d at 593-94, 584 N.E.2d at 275. The same is true in this case where the children were properly adjudicated wards of the court at the disposition hearing which followed the temporary custody hearing. As a result, mootness and waiver aside, remand would be unwarranted.

Respondent next contends that the trial court's finding of nonorganic failure to thrive for Cassio, on which it based Eddie's and Ariel's findings of neglect, was against the manifest weight of the evidence. In the alternative, he argues that, even if Cassio's diagnosis of nonor-

ganic failure to thrive was proper, the findings of neglect as to Ariel and Eddie were against the manifest weight of the evidence. We disagree.

▮ Following a child's placement in temporary custody, the court must make a finding of abuse, neglect or dependence before it conducts an adjudication of wardship. 705 ILCS 405/2—21 (West 2002). In determining whether a child is neglected, the State must prove the allegations of neglect by a preponderance of the evidence, meaning it must demonstrate that the allegations are more probable than not. *In re N.B.*, 191 Ill. 2d 338, 343, 730 N.E.2d 1086, 1088 (2000); *In re Arthur H.*, 338 Ill. App. 3d 1027, 1035, 789 N.E.2d 890, 896 (2003). A reviewing court will not reverse a trial court's finding of neglect unless it is against the manifest weight of the evidence. *In re Arthur H.*, 338 Ill. App. 3d at 1035, 789 N.E.2d at 896. The court's determination is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *In re Arthur H.*, 338 Ill. App. 3d at 1035, 789 N.E.2d at 896. Under this standard of review, the reviewing court must give deference to the trial court's findings of fact as the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses, assess their credibility, and weigh the evidence. *In re Arthur H.*, 338 Ill. App. 3d at 1035, 789 N.E.2d at 896.

▮ Neglect is generally seen as a "failure to exercise the care that circumstances justly demand and encompasses both wilful and unintentional disregard of parental duty." *In re Arthur H.*, 338 Ill. App. 3d at 1035, 789 N.E.2d at 896. Pursuant to the Juvenile Court Act, a minor may be neglected where his "environment is injurious to his *** welfare." 705 ILCS 405/2—3(1)(b) (West 2002). The term "injurious environment" is generally interpreted to include "the breach of a parent's duty to ensure a 'safe and nurturing shelter' for his or her children." *In re N.B.*, 191 Ill. 2d at 346, 730 N.E.2d at 1090, quoting *In re M.K.*, 271 Ill. App. 3d 820, 826, 649 N.E.2d 74, 79 (1995). However, our courts have recognized that the concept of neglect has no fixed meaning and that the term "injurious environment" is "an amorphous concept." *In re N.B.*, 191 Ill. 2d at 346, 730 N.E.2d at 1090; *In re Arthur H.*, 338 Ill. App. 3d at 1035, 789 N.E.2d at 896; *In re J.P.*, 331 Ill. App. 3d 220, 234, 770 N.E.2d 1160, 1172 (2002). As a result, cases addressing an adjudication of neglect and wardship are *sui generis* and must be considered according to their own particular facts. *In re Arthur H.*, 338 Ill. App. 3d at 1035, 789 N.E.2d at 896; *In re Christina M.*, 333 Ill. App. 3d 1030, 1034, 777 N.E.2d 655, 659 (2002).

Citing *In re K.G.*, 288 Ill. App. 3d 728, 682 N.E.2d 95 (1997), and *In re Edricka C.*, 276 Ill. App. 3d 18, 657 N.E.2d 78 (1995), respondent

argues that the State's evidence that Cassio's failure to thrive was nonorganic was rebutted by the presentation of evidence that his failure to thrive was organic and, therefore, not the result of neglect. See *In re K.G.*, 288 Ill. App. 3d at 736, 682 N.E.2d at 100; *In re Edricka C.*, 276 Ill. App. 3d at 28, 657 N.E.2d at 84 (*prima facie* evidence of neglect creates only a rebuttable presumption which may be overcome by other evidence). Respondent asserts that both Dr. Gomez and Dr. Zun agreed that the primary factor in diagnosing a failure to thrive is the child's weight gain during hospitalization; but, he argues, Cassio's medical records did not reveal a weight gain significant enough to support Dr. Gomez's diagnosis of nonorganic failure to thrive. He further states that Dr. Zun's diagnosis of organic failure to thrive was wholly supported by the medical records. In response, the State argues that the trial court erred in qualifying Dr. Zun as an expert witness.

Dr. Gomez testified at the adjudicatory hearing that when Cassio arrived at the hospital, he had not received any immunizations and he could not sit up or crawl. His blood, lead, urine and neurological tests were normal and he gained approximately one pound during his first week of hospitalization. Dr. Gomez stated that all of these symptoms pointed to a diagnosis of nonorganic failure to thrive. To the contrary, Dr. Zun concluded that, although Cassio's failure to thrive was the result of his inability to gain weight, it was organic in nature and was the result of esophageal reflux, a neurological impairment and the small stature of his parents. The court concluded that Dr. Gomez's testimony was more credible as he was Cassio's treating physician while the child was in the hospital. As previously stated, the trial court is in the best position to observe the conduct and demeanor of the witnesses, assess their credibility, and weigh the evidence. *In re Arthur H.*, 338 Ill. App. 3d at 1035, 789 N.E.2d at 896. We will not reassess witness credibility or reweigh the evidence, and we find no reason to overturn the trial court's findings regarding Dr. Gomez's testimony. See *In re Chyna B.*, 331 Ill. App. 3d 591, 595, 772 N.E.2d 301, 305 (2002). Contrary to respondent's argument, Dr. Gomez's inability to recall details without Cassio's medical records and to convert grams to pounds in his head did not render his testimony unbelievable.

Furthermore, although the evidence of Cassio's improvement while hospitalized was not overwhelming, there is sufficient support for Dr. Gomez's testimony and the trial court's determination in the record. Cassio's medical records reflect that when Cassio was admitted on August 24, 2001, he weighed 6,340 grams. By September 2, 2001, he weighed 6,800 grams (a weight gain of approximately one pound), and on September 13 he weighed 6,870 grams. Although Cassio's weight

decreased 130 grams between September 13 and 14, the day he was discharged, the records reflect that he had contracted a virus and had been running a fever for a few days. Regardless, the record sufficiently supports the testimony of Dr. Gomez that Cassio gained about one pound during his first week in the hospital and that he continued to gain a significant amount of weight during the rest of his hospitalization.

The medical records also indicate that Cassio was eating well while in the hospital and that his developmental delays improved. Upon admission, Cassio could not sit up or crawl, but the medical notes reflect that by September 10, 2001, Cassio was lifting his head better and he had begun to crawl. Hospital staff notes also support the hearing testimony that Latrena was "defensive" when informed about the child's condition and that she denied that there was anything wrong with him. Latrena refused to discuss Cassio's diet, stating that she knew what her baby ate. Although respondent asserts that as of August 24, 2001,[2] Cassio's immunizations were current, the medical records indicate that Cassio was given his first immunizations on that date, when he should have already received three sets of immunizations by that time.

In sum, given the testimony of Dr. Gomez and the medical records introduced at trial, we cannot find that the trial court's determination that Cassio had nonorganic failure to thrive due to parental neglect was against the manifest weight of the evidence. Dr. Gomez's testimony and the records sufficiently satisfied the standard of proving the allegations of neglect were more probable than not and we cannot find that the opposite conclusion was clearly evident. *In re N.B.*, 191 Ill. 2d at 343, 730 N.E.2d at 1088. Because we find there was sufficient support for the court's determination that Cassio suffered from nonorganic failure to thrive despite Dr. Zun's testimony, we need not address the State's contention that Dr. Zun should not have been qualified as an expert witness in pediatric medicine.

Despite this determination that there was sufficient evidence to support Cassio's diagnosis of nonorganic failure to thrive, respondent contends that the findings of neglect for Eddie and Ariel were still against the manifest weight of the evidence. He asserts that the children's immunizations were current, there was no evidence of abuse or neglect and there was no urgent and immediate necessity to remove the children from their home. He urges that the court erred in adjudicating Eddie and Ariel neglected based solely on Cassio's nonorganic failure to thrive.

---

[2]Respondent's brief provides the date August 24, 2002, for Cassio's immunizations; however, the hospital records to which he cites are dated 2001.

■ As previously stated, neglect is generally seen as a "failure to exercise the care that circumstances justly demand." *In re Arthur H.*, 338 Ill. App. 3d at 1035, 789 N.E.2d at 896. An injurious environment is defined by a parent's failure to provide a safe and nurturing shelter for his children (*In re N.B.*, 191 Ill. 2d at 346, 730 N.E.2d at 1090), and proof of neglect of one minor is admissible evidence as to the neglect of another minor for whom the parent is responsible. 705 ILCS 405/ 2—18(3) (West 2002). However, such neglect should be measured not only by the circumstances surrounding the sibling, but also by the care and condition of the child in question. *In re Arthur H.*, 338 Ill. App. 3d at 1036, 789 N.E.2d at 897.

■ In considering the alleged neglect of Eddie and Ariel, the trial court heard the previously discussed testimony of Dr. Gomez and Dr. Zun regarding Cassio's failure to thrive. The court further considered the testimony of John Gac, who testified that Eddie and Ariel displayed no visible signs of abuse or neglect, but that Latrena admitted Ariel was behind on her immunizations. Gac stated that Latrena denied there was anything wrong with Cassio and asserted that her opinion was as valid as the doctor's due to her training as a nurse's assistant. Gac believed that Cassio's diagnosis, combined with Eddie's and Ariel's young age, put Eddie and Ariel at risk of neglect. The court next heard the testimony of social worker Marjorie Kaplan. Like Gac, Kaplan testified that Latrena insisted Cassio was fine, but admitted that he was behind on his immunizations. Latrena told Kaplan that her children's development was normal and she dismissed the opinions of the hospital staff.

This testimony, combined with the medical records previously discussed, adequately established that Cassio suffered from nonorganic failure to thrive, that Latrena refused to address Cassio's medical condition and Cassio's and Ariel's developmental disabilities, and that Ariel and Cassio were behind on their immunizations. In turn, these findings sufficiently supported the trial court's determination of neglect for Eddie and Ariel, and we cannot find that the opposite conclusion was clearly evident.

Citing *In re K.G.*, respondent argues that Cassio's nonorganic failure to thrive alone does not sufficiently support the finding of injurious environment as to his siblings because there was no evidence that Eddie and Ariel were abused or neglected. *In re K.G.*, 288 Ill. App. 3d at 736, 682 N.E.2d at 100. In *K.G.*, the respondent gave birth to two children with cocaine in their systems. The respondent was also the mother of two older children. Although DCFS did not attempt to remove any of the children from their mother's care due to her drug use, she did receive counseling and rehabilitation which were

both reportedly successful. Subsequently, the respondent's youngest child died in what was determined to be an accident, and DCFS removed the remaining three children from the respondent's care. At the adjudicatory hearing for the two older children, the trial court found that the children were not neglected even though the two younger siblings were born with cocaine in their systems. This court agreed, stating that although a parent's neglect of one child may be considered when determining whether a sibling is exposed to an injurious environment, such *prima facie* evidence of neglect only creates a rebuttable presumption which may be overcome by other evidence. *In re K.G.*, 288 Ill. App. 3d at 736, 682 N.E.2d at 100. We found that the presence of cocaine in the younger children's systems was not sufficient to show that the two older children were neglected, particularly when the evidence showed that the respondent had been drug free for over one year before the children were removed from her care and that no effort had ever been made to remove the children from her before the accidental death of her youngest child, despite DCFS knowledge of her drug use. *In re K.G.*, 288 Ill. App. 3d at 736-37, 682 N.E.2d at 100.

Respondent compares the instant case to *K.G.* in arguing that Cassio's nonorganic failure to thrive was not sufficient to establish that Eddie and Ariel were neglected. We disagree. In *K.G.*, this court held that the neglect of one child is *prima facie* evidence of the neglect of that child's siblings. However, in *K.G.*, there was sufficient evidence to overcome the *prima facie* case established by the evidence of the younger children's drug exposure. Here, unlike *K.G.*, there was no evidence offered at the adjudicatory hearing to overcome this *prima facie* evidence of Cassio's neglect. In fact, there was evidence with respect to Eddie and Ariel that bolstered the *prima facie* evidence of neglect engendered by Cassio's condition. As previously stated, the evidence showed that Latrena failed to accept or address Cassio's medical problems, that Ariel also suffered from developmental delays requiring therapy, and that Ariel had not received her immunizations because respondent failed to take her to the doctor for over a year. Furthermore, the manifest weight standard of review is highly deferential to the trial court. In *K.G.*, the trial court found the State had not established neglect, and this court could not find on appeal that such a determination was against the manifest weight of the evidence. Likewise, in this case, the trial court found Eddie and Ariel to be neglected and we cannot find that the opposite conclusion was clearly evident.

Respondent also compares this case to *In re N.B.*, 191 Ill. 2d 338, 730 N.E.2d 1086 (2000), where the Illinois Supreme Court reversed a

finding of neglect due to an injurious environment. In *N.B.*, the trial court found the respondent's two children to be neglected due to two incidents during which the respondent displayed inappropriate anger toward employees of the health department. However, the supreme court noted that the anger in those incidents was not directed at the children, nor was there any proof of any mistreatment or actual harm to either of the two children. *In re N.B.*, 191 Ill. 2d at 351, 730 N.E.2d at 1093. Because there was no evidence suggesting that the respondent had not fulfilled her duty to provide a safe and nurturing shelter, the court reversed the trial court's finding of neglect and the appellate court's affirmance of that finding. *In re N.B.*, 191 Ill. 2d at 351-54, 730 N.E.2d at 1093-94.

The instant case is distinguishable from *N.B.*, however, in that here there was evidence of actual harm to one of the children—Cassio suffered from nonorganic failure to thrive due to inadequate nutrition. Furthermore, when informed of Cassio's condition, Latrena denied he was malnurished or developmentally delayed. She also denied Ariel was developmentally delayed, and she refused to accept or even consider the doctor's opinion. Unlike the children in *N.B.*, Eddie and Ariel were found to be neglected based on evidence of actual harm caused to their sibling and their mother's refusal to address that harm, as well as evidence that Ariel's developmental and medical needs were not being met.

Finally, respondent contends that the trial court abused its discretion in failing to grant him custody of his two children. Respondent argues that he was a fit and able parent as evidenced by the lack of allegations of abuse or neglect against him, his completion of all required services and his consistent visitation with the children. He further argues that the court should not consider the fact that he was living with Latrena at the time of the disposition hearing as there is no evidence he was told to "evict" her.

■ Under section 2—27(1) of the Juvenile Court Act, the trial court may commit a minor to DCFS wardship if it determines that the parent is unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor and that the health, safety, and best interests of the minor will be jeopardized if the minor remains in the custody of the parent. 705 ILCS 405/2—27(1) (West 2002). Generally, both parents must be adjudged unfit or unable to care for a child before placement with DCFS is authorized, as the child's biological parents have a "superior right of custody" unless such a finding has been made. *In re Arthur H.*, 338 Ill. App. 3d at 1041, 789 N.E.2d at 901. However, we note that an adjudication of wardship under section 2—27 is not a complete termination of all

parental rights. See *In re Lakita B.*, 297 Ill. App. 3d 985, 993-94, 697 N.E.2d 830, 836 (1998) (parental rights may be permanently terminated under section 2—13 or 2—29(2) of the Act). The nonpermanent nature of the ruling is evidenced in this case by the court's setting of a date for a permanency planning hearing within the disposition order.

■ Although we agree that the record shows respondent was cooperative in completing the services recommended by DCFS and that he was a noncustodial parent when the children were removed from their home, the State is correct in its assertion that the purpose of the dispositional hearing was for the court to determine whether it was in the best interests of the children to be made wards of the court. See *In re J.J.*, 327 Ill. App. 3d 70, 77, 761 N.E.2d 1249, 1255 (2001) (child's best interests are superior to all other factors even if the parent is not found to be unfit); see also *In re Chyna B.*, 331 Ill. App. 3d at 597, 772 N.E.2d at 306-07. In this regard, the court could consider any evidence presented at the hearing pertaining to the children's best interests, including respondent's living arrangements. See *In re S.S.*, 313 Ill. App. 3d 121, 129, 728 N.E.2d 1165, 1171 (2000) (a "very important" factor to consider in determining wardship is whether a parent who did not inflict abuse or neglect is living in the home with the parent who did). The court was not, as respondent argues, limited to only considering respondent's compliance with DCFS service plans. See *In re C.N.*, 196 Ill. 2d 181, 214-15, 752 N.E.2d 1030, 1049 (2001).

Clearly, the fact that respondent was living with Latrena was a concern for DCFS and the trial court. Moriarity testified that she raised this concern with respondent and he told her in February 2002 that Latrena would be moving out of his apartment. However, Latrena's June 2002 psychological evaluation reflects that she was still living with respondent at that time. In addition, the trial court noted there was no indication respondent was willing or able to protect the children from Latrena's temper, as evidenced by the May 2001 visitation, during which Latrena confronted Eddie and respondent did not protect him or divert her. As a result, respondent's behavior at the May 2001 visitation, combined with the fact that he was living with Latrena, provided sufficient grounds for the court to conclude that respondent was unable to protect Eddie and Ariel and the best interests of the minors would be jeopardized if respondent was granted custody. Therefore, the children were properly adjudicated wards of the court without finding respondent unfit and without finally terminating his parental rights, and the court will continue to monitor its remaining questions as to respondent's ability to parent and protect his children from their mother, the parent who initially perpetrated

the neglect. See *In re Chyna B.*, 331 Ill. App. 3d at 597, 772 N.E.2d at 306-07.

Accordingly, we cannot find the court's actions were an abuse of discretion given the circumstances at the time of its judgment. The judgment of the circuit court is affirmed.

Affirmed.

McNULTY and McBRIDE, JJ., concur.