JUSTICE HALL delivered the judgment of the court, with opinion.
*333 ¶ 1 Following adjudication and dispositional hearings, minor Davion R. (the minor) was adjudged to be abused and neglected based on a failure to thrive and made a ward of the court and respondent, Davon R., the natural father of the minor, was found to be unable only to parent him.[1] On appeal, respondent contends that: (1) the circuit court erred in not appointing counsel after vacating the initial appointment of counsel prior to the adjudication and dispositional hearings; and (2) the circuit court's findings were against the manifest weight of the evidence.
¶ 2 We initially filed an opinion reversing the trial court's order that vacated the appointment of counsel for respondent September 29, 2017. On October 19, 2017, the Cook County State's Attorney filed a petition for rehearing which was adopted by the appointed Guardian ad Litem . Pursuant to this court's order, respondent filed a response to the petition for rehearing. After review of the petition for rehearing and response, we deny the petition for rehearing and vacate our previous opinion. For the reasons that follow, we affirm.
¶ 3 I. BACKGROUND
¶ 4 A. Petition for Adjudication of Wardship
¶ 5 On April 29, 2015, the State filed a Petition for Adjudication of Wardship alleging that the minor, born July 13, 2013, was abused because of substantial risk of physical injury and neglected because of an environment injurious to his welfare and was without the care necessary for his well-being.
¶ 6 The petition alleged that the minor had been taken into custody on April 27, 2015, after his doctor observed that he was emaciated and malnourished. At a prior doctor's appointment on April 16, 2015, the doctor expressed concern about the minor's lack of weight gain and suggested hospitalization. At that time, respondent became agitated and left with the minor against medical advice. The doctor notified the Department of Children and Family Services (DCFS), who began searching for the minor. The minor was subsequently located on April 22, 2015, and hospitalized. During the hospitalization, the minor was diagnosed with failure to thrive, non-organic, due to inadequate nutrition. At a temporary custody hearing held on April 29, 2015, the circuit court found probable cause to find the minor abused/neglected and that there was an imminent/urgent necessity to remove him from the home and placed in the care of DCFS.
*334 *530 ¶ 7 The circuit court appointed Monica Torres (attorney Torres) as counsel for respondent on May 4, 2015, because he was indigent. The minor was initially placed in a relative foster home with respondent's cousin, but on June 29, 2015, the minor was moved to a traditional, non-relative foster home in the care of Ms. Robinson. Respondent filed several motions: a motion for unsupervised visitation, a motion to change the caseworker, a motion to return the minor to a relative foster parent, and a motion to return the minor home to respondent. The court determined that the minor should stay in his traditional foster home under the care of the original caseworker but granted respondent's request for unsupervised visitation. Respondent was granted supervised visits three times per week for two hours each visit. On July 17, 2015, the visits were reduced to twice weekly because respondent needed to participate in services.
¶ 8 B. September 2015 Status Hearings
¶ 9 At a status hearing on September 3, 2015, Makeda Langdon, respondent's caseworker from ChildLink (the agency), reported that respondent received unsupervised day visits on Mondays from 9 a.m. to 3 p.m. at the paternal grandmother's home and two supervised day visits on Wednesdays and Fridays. Langdon reported that the visits were going well outside of respondent being angry or upset about something. Respondent verbally objected to the minor having only gained two pounds since being in foster care for six months. The foster parent stated that respondent was "hideous" and complained about everything. The foster parent also stated that the minor was a picky eater.
¶ 10 On September 29, 2015, attorney Torres filed a motion to withdraw and sought a hearing on the same day during a status hearing. Included with the motion was a copy of attorney Torres' letter to respondent which noted that he failed to return her calls on September 23 and September 24, 2015, and advised him that he had 21 days to find other counsel or enter a supplemental appearance. At the hearing, attorney Torres indicated that she last spoke with respondent at the last hearing and that respondent wished to represent himself. The court admonished respondent that it would be a mistake to discharge counsel and a greater mistake to represent himself. The court continued the motion to withdraw and admonished respondent and attorney Torres to work together.
¶ 11 The status hearing continued and the minor's case aide, Ariel Haynes, reported that she spoke to gastroenterologist Dr. Tiffany Patton. Dr. Patton requested the minor's medical history, which Haynes was unable to supply. Dr. Patton indicated that the minor had lost one pound. Haynes provided Dr. Patton with information on what she observed as the minor's eating habits as well as what was relayed by the foster parent, namely, that the minor liked spaghetti and foods like that, but preferred "junk" food. Dr. Patton prescribed Pediasure twice daily and Haynes told the foster parent that the minor needed to consume 1380 calories a day.
¶ 12 Langdon reported that she had several conversations with the foster parent during home visits about the minor's feeding. She also stated that she saw the minor eat healthy, regular meals and that he continues to drink the PediaSure. During respondent's visits, he provided snacks for the minor. At the end of the hearing, respondent asked how long would the proceedings continue without the minor gaining weight, but he left the courtroom before the hearing concluded. The court gave the agency discretion to add another day of unsupervised visits for respondent and noted that respondent was very devoted to his son but appeared to have "serious emotion *531 *335 issues and distrust of the court and system." The court admonished the attorneys and caseworker to "make a special effort to rise above any reactions that [the respondent] may have to that or as a result of his distress and fear." Visitation was then changed to two unsupervised day visits twice weekly and two supervised visits twice weekly.
¶ 13 C. November 2015
¶ 14 On November 10, 2015, the court entered a visitation order granting respondent unsupervised visits more than twice weekly at the discretion of DCFS. The court also allowed overnight visitation pending respondent's commencement of services and the minor's visit with a specialist. Respondent then began unsupervised visits three days a week for six hours. Attorney Torres withdrew her motion to withdraw at that time.
¶ 15 D. December 2015 Status Hearings
¶ 16 At a December 2, 2015, status hearing, attorney Torres submitted a report of the minor's visit with Dr. Patton dated November 13, 2015, which indicated that the minor weighed 23 pounds, 5.9 ounces. Attorney Torres argued that the minor had not gained any weight since the last medical report of September 18, 2015, and that the failure to gain weight occurred under the foster parent's supervision. Attorney Torres told the court that respondent was present at the latest medical appointment and was willing to follow all eating instructions provided in the report. Respondent's motion for return home of the minor under an order of protection was renewed.
¶ 17 At the same hearing, Langdon testified that respondent completed a new "JCAP"[2] which was necessary for him to be admitted into a substance abuse program, and that he could not engage in any other services until he addressed his substance abuse issues. She further noted that respondent had not completed individual therapy, anger management, psychological and psychiatric evaluations. The court expressed concern that the minor was losing weight since being in foster care. Respondent testified that the foster parent did not provide meat for the minor, claiming that he would not eat it, but respondent had photos of the minor eating meat. Respondent accused the court of destroying his and the minor's lives because it was holding the minor without helping them.
¶ 18 The next status hearing was on December 22, 2015. Attorney Torres was present but respondent was not. The minor had been admitted to the University of Chicago Comer Children's Hospital (Comer) and respondent was there with him.
¶ 19 Additionally, Langdon testified that when the case aide picked up the minor from a visit with respondent, respondent was angry, using profanity, blocking her car and making shooting motions. The aide filed a police report and all upcoming pick ups and drop offs for the minor would occur at a police station.
¶ 20 A hearing was conducted on December 29, 2015, on the Guardian ad Litem 's (GAL) motion to vacate the order granting respondent unsupervised day visits. Attached to the motion was a medical report from Comer which noted that the minor was hospitalized from December 19 until December 24, 2015, and there was no evidence of any underlying diseases or oral aversion. While the minor was a picky eater, he would eat with encouragement. The report further noted problems with respondent's interactions while at Comer; namely, that he was hostile with staff, angry and had frequent outbursts; he described the minor as being kidnapped; he *336 *532 was manipulative in trying to get food trays for himself; he photographed the doctors during their rounds; he was found many times on the floor listening to music while the minor ran around; he never showed concern about the minor; and his description of the minor as a good eater was contrary to what the staff noted. The report recommended that respondent undergo a mental health assessment and parenting assessment, that unsupervised visits be terminated and that the foster parent keep a dietary journal.
¶ 21 Langdon testified that the agency was in agreement with Comer's recommendation that visits between respondent and the minor be reduced to supervised visits only. She noted that the minor had regressed in his weight gain and that the unsupervised visits had been suspended the day prior to the hearing. Respondent told the court that this was the first he learned of his unsupervised visitation being suspended. Langdon proposed supervised visits three times per week during lunchtime so respondent could be assisted in keeping eating logs and in following the proposed nutritional plan made by the hospital. Respondent asked for support in nutrition classes but Comer did not have those types of classes. Comer did offer to have someone speak to respondent and give him ideas for meals. The proposed visitation schedule would allow respondent to bring meals for the minor and document the feeding, which would be supervised by the agency so that it could be reported to the doctors. Langdon also recommended a parenting coach to assist respondent with the minor's feedings.
¶ 22 Langdon further testified that the minor's foster home was not a specialized foster home and that another child had recently been added to the home. She noted that it could take up to one hour for the minor to eat breakfast or lunch, and the foster parent was a bus driver who worked from 9 a.m. until 6 p.m. The minor attended daycare on Mondays, Wednesdays and Fridays from 7 a.m. until 8:15 a.m., where he had breakfast. Respondent picked the minor up from daycare and cared for him the rest of the day. On Tuesdays and Thursdays, the minor was at daycare until 5 p.m., and on the weekends, the foster parent cared for the minor.
¶ 23 Langdon also stated that the foster parent was given paperwork and instructions on the minor's dietary needs and meal planning after his discharge from Comer in December. Langdon indicated that the proposed new supervised visits would take place at the nature room of the courthouse. The court opined that the nature room was not an acceptable place for those visits and wanted the visits to be closer to the daycare. Langdon also noted that Dr. Jill Glick recommended that a specific type of formula be given to Davion, but she did not know if the agency would provide it for respondent during his visits. She also did not know what types of food Comer recommended that respondent bring to the visits, but noted that a case aide would be supervising the lunchtime visits. Langdon described the relationship between respondent and the foster parent as "strained" but she asked the foster parent to try and get along with respondent. The minor would have weekly doctor visits, and respondent would be able to attend those visits.
¶ 24 Langdon explained that at the time of the hearing, respondent was engaged in outpatient substance abuse treatment, and the agency was seeking a parenting capacity assessment for him. Langdon testified that respondent was bonded to the minor and loved him.
¶ 25 At the request of attorney Torres, the circuit court allowed a recess after Langdon's direct examination for an attorney-only *533 *337 conference. At the conference, attorney Torres indicated that respondent was upset about the GAL's motion to suspend his unsupervised visitation. She stated that she had discussed the motion with respondent at length the day before the hearing, even though he indicated during the hearing that he did not know about the motion. Attorney Torres reminded the court that she had tried to withdraw from the case before, and that respondent told her he did not want her to represent him.
¶ 26 The circuit court told attorney Torres that it was not in respondent's best interests to represent himself, and that it would not grant a motion to withdraw. The court further indicated that respondent was obviously distraught, and had some personality issues that were "somewhat aggravating to people, and so you know, this is one of the reasons why I'm not going to allow you to withdraw because he needs a filter."
¶ 27 The hearing then resumed. When the court instructed attorney Torres to begin cross-examination of Langdon, respondent interjected that he did not want her to represent him, arguing that she never told him that his unsupervised day visits were going to be suspended but only that there would be no more overnight visits. Respondent argued that he was being penalized for the minor's failure to thrive while in foster care, and noted that he gained 600 grams while he was in the hospital being fed only by respondent. The court informed respondent that the hearing would not continue unless he allowed his attorney to cross-examine the witness. Respondent then acquiesced in attorney Torres' continued representation.
¶ 28 During cross-examination, attorney Torres introduced a November 13, 2015, medical report from Comer which indicated that the minor lost .30 pounds since his visit two months prior, while under the care of his foster parent.
¶ 29 Respondent testified and expressed concern that the foster parent was not spending the majority of the day with the minor and that there were three different people feeding the minor in three different ways. Respondent testified that the minor gained weight while hospitalized at Comer because he took the time to feed the minor, and he provided the court with a food journal. Further, he contended that Comer never told him what foods to order for the minor while he was in the hospital. Respondent argued against being penalized for being with the minor only 18 hours per week, and denied the characterization of his behavior at Comer; he instead described it as one misunderstanding that became characterized as a security problem. Respondent also took issue with no testimony being presented about the many hours of care and concern he showed while the minor was in the hospital, arguing that his positive actions were minimized while disagreements are highlighted. He described Langdon as being "deceptive" and contended that she failed to inform him that the agency suspended his unsupervised visits the previous day. He further argued that the agency and the environment they created were not conducive to the minor gaining weight.
¶ 30 The court questioned respondent about the food journal that he created while the minor was at Comer and subsequently ordered a detailed nutritional plan for the minor. The court concluded that the minor's weight loss was due to the foster mother never being around during the day to spend an hour at breakfast and lunch to feed him. The court suspected that the daycare was putting food in front of the minor, who would pick at it, and then they would take it away. The court also expressed concern that respondent *338 *534 was expected to bring food to the visits and engage in services towards reunification all while being unemployed. Attorney Torres noted that respondent's outbursts were due in part to his frustration that the minor's failure to thrive symptoms persisted under DCFS's care, and the GAL told the court that the minor should probably be placed in a specialized foster care home.
¶ 31 The court issued a visitation order that limited visits for respondent to supervised visits only. The court also issued an order that required: 1) the agency to provide respondent with a therapist and for individual therapy to begin within 14 days; 2) respondent to be provided with a detailed nutrition plan with hourly food intake and menus; 3) the agency, at its expense, to provide respondent with the Pediasure that the minor was required to ingest during lunchtime; 4) the caseworker attend all supervised visits; 5) the supervised visits occur at a place more suitable than juvenile court; 6) the agency provide respondent with transportation to visits and services; 7) respondent be given a mental health assessment within 14 days; and 8) CIPP[3] occur within 14 days to assess whether the minor needed to be placed in specialized care. Upon realizing that the court was not reinstating unsupervised visits, respondent argued that his conduct at Comer was unrelated to the minor's health issues.
¶ 32 E. January 2016 Hearing
¶ 33 On January 29, 2016, at an attorney-only conference prior to a status hearing, attorney Torres informed the court that respondent made an "inappropriate" threat to her during a phone call on January 4, 2016, although it did not rise to the level of jeopardizing her physical safety. Additionally, on January 11, 2016, respondent called attorney Torres inappropriate names and said that she was not his attorney. Because respondent had also indicated that he was getting his own attorney, attorney Torres brought her case file with her to hand over to the new attorney. However, when she checked the court's file, no other attorney had filed an appearance.
¶ 34 When respondent arrived to court, he told the court that he did not know why attorney Torres was there because he "fired her." He stated that he did not want attorney Torres, that he had the right to and would do it himself and that he would leave if the court did not allow him to represent himself. Respondent also acknowledged the court's previous admonishment about representation by counsel being in his best interests. The court indicated that if respondent absolutely insisted on terminating appointed counsel, it would enter an order doing so, but that it was not in respondent's best interests in the court's opinion. Attorney Torres indicated that she had no objection to vacating her appointment and the circuit court subsequently vacated the appointment. The record indicates that a written order, prepared by attorney Torres, was entered stating that her appointment to represent respondent was vacated on counsel's oral motion. The hearing then commenced regarding a status on visitation, after which, the matter was continued to March 11, 2016, for a status on discovery.
¶ 35 F. Adjudication Hearing
¶ 36 Subsequently, an adjudication hearing was scheduled for June 23, 2016. At that time, respondent appeared pro se . The circuit court offered respondent the assistance of a bar attorney and strongly suggested that respondent use appointed counsel even as standby counsel but respondent declined the offer. The adjudication *535 *339 hearing commenced. Debra Robinson, a child protection specialist for DCFS, testified that she received a hotline report on approximately April 16, 2015, indicating that the minor was diagnosed by his primary care physician as malnourished. The doctor wanted to hospitalize him but respondent left the office. The doctor described respondent as being "discombobulated." When Robinson was assigned to the case, respondent's whereabouts were unknown, but she eventually located the minor at his grandmother's home, and she learned that respondent was incarcerated. The minor's aunt agreed to accompany Robinson to Comer's emergency room, and the minor was subsequently hospitalized for five days. DCFS took custody of the minor when he was medically ready for discharge from the hospital.
¶ 37 Dr. Jill Glick is board-certified in pediatrics, emergency medicine and pediatric child abuse. She is the Medical Director of Child Advocacy and Protective Services at Comer and was qualified as an expert witness for the State in pediatrics and child abuse pediatrics. She testified that in December 2015 she was contacted by the minor's treating team to consult on the case. She reviewed the minor's primary care physician's and Comer's records and spoke to his social worker and treating team of physicians in order to do so. Dr. Glick testified that it was important that the minor's caretakers collaborate and communicate effectively as to how the minor was doing during the day. She further testified that a failure to thrive is a medical emergency from a developmental standpoint and that it is also a manifestation of a lack of appropriate caretaker-patient relationship resulting in behavioral issues due to a lack of bonding. Children who are chronically malnourished develop abnormal behaviors such as pickiness, oral aversion and difficulty eating. When the minor was initially admitted to the hospital, he was picky, very slow to eat and resistant to feeding. By his second admission in December 2015 for failure to thrive, the minor showed behaviors that were "concerning." Dr. Glick was concerned about the lack of collaboration between respondent and the foster parent around unsupervised visits resulting in inconsistencies and inadequate calories.
¶ 38 Dr. Glick further testified that the minor was hospitalized in April 2015 due to a weight loss from 10 to 9.9 kilos over a couple of months. Subsequent testing revealed that the cause of his failure to grow was inadequate caloric intake, and he did not appear to have any special feeding issues. While in the hospital, the minor was a picky eater but was within the realm of normal for a toddler. Within five days of being hospitalized, the minor reached the highest weight he had in prior months. He was diagnosed with malnourishment, secondary to inadequate caloric intake, secondary to lack of appropriate environmental administration of food. When the minor was discharged, he was to be placed in foster care and given a normal toddler diet supplemented by PediaSure. DCFS, not the hospital, determined that the minor should not be returned to respondent. At the minor's initial discharge, Dr. Patton reviewed the diet with the foster parent and at every subsequent visit she reviewed the minor's dietary history.
¶ 39 Dr. Glick also testified that in July 2015, respondent was granted unsupervised visits with the minor and the minor experienced a weight loss of .4 kilos between August and September 2015, which she described as a "significant weight loss." Dr. Glick testified that in September 2015, Dr. Patton recommended increasing the minor's caloric intake by giving him PediaSure. In November 2015, the minor's weight was the same as it was in September, 10.6 kilos. It was then recommended *340 *536 that the minor be readmitted to the hospital. Dr. Patton met with both respondent and the foster parent to review the minor's dietary history. The foster parent described the minor as a picky and slow eater. Conversely, respondent described the minor as having a good appetite and eating well. At the hospital, respondent was observed sharing plates with the minor, which made it difficult to determine how much he was eating. The foster parent gave a very structured approach to what she fed the minor and how often the supplement was given. On the other hand, respondent reported that he often fed the minor "on the go." Because of the disparity in eating reports, the doctors concluded that it was best to readmit the minor.
¶ 40 During the examination of Dr. Glick, respondent interjected that he was going to leave and get proper counsel because he only had the minor for 18 hours a week and did not like being blamed for the second failure to thrive. Respondent also said that if he stayed, he was going to get "locked up. They're using medical jargon, legal bull**** to continue to take my - keep my baby from me. I had that baby 18 hours." The State objected to stopping the hearing because respondent had been given opportunities to obtain an attorney and previously indicated that he would get his own attorney, but did not. The court ruled that it would allow the State to complete Dr. Glick's examination and continue the case so that respondent could order a transcript to review with a new attorney and prepare. Respondent then left the hearing.
¶ 41 Dr. Glick's testimony then continued. On December 19, 2015, the minor was readmitted to Comer because he had not been gaining weight. The situation was not ideal at home, and the minor needed to be reassessed. Between December 19 and December 24, 2015, the minor gained .4 kilos while hospitalized. At that time, the minor was very difficult to feed; one had to sit and slowly feed him. Dr. Glick stated that respondent did not accept the diagnosis of malnourishment and was adversarial with the staff. He videotaped the doctors and staff; he often sat in the middle of the nurses' station, listening to headphones instead of engaging with the minor; he was disruptive and stressed the hospital staff; he used "shameful" words with the staff and made inappropriate hand signals. The staff was very concerned with respondent's lack of engagement and parenting skills, which caused the doctor to conclude that respondent was not providing the minor with adequate caloric intake. Dr. Glick was concerned that respondent had a mental health problem, and due to the observations of respondent during the December 2015 hospitalization, she had concerns with the unsupervised meals. She also noted that the lack of partnership between respondent and the foster parent did not help the minor. While it was clear that respondent loved the minor, his erratic behavior, use of foul language, anger at the staff and refusal to learn how to take care of the minor gave her concern about respondent's ability to care for the minor. Dr. Glick did not believe that respondent demonstrated the capacity and insight to care for the minor. When the minor was discharged after the December hospitalization, a menu plan was reviewed with the foster parent and the minor was diagnosed with chronic malnourishment and a failure to thrive, secondary nutritional neglect.
¶ 42 At a check-up on January 26, 2016, the minor's weight was 11.3 kilos, an increase from 11.1 kilos (approximately one half pound) since his December discharge. The minor was given Periactin to stimulate his appetite. Dr. Glick testified that respondent's inability to collaborate and coordinate with the foster parent resulted in a less than optimal plan between the two caretakers.
*341 *537 ¶ 43 The hearing was continued until August 25, 2016. Respondent again appeared pro se . The circuit court again offered him a bar attorney and he again declined. Respondent cross-examined Dr. Glick by asking her if she was present during his stay with the minor at the hospital. Dr. Glick responded that she was but not the entire time.
¶ 44 Dr. Glick's curriculum vitae was entered into evidence. The State also submitted the following documents for admission into evidence: certified and delegated records from Heartland Health Care and certified and delegated medical records from Comer Children's Hospital. The medical records indicated that the minor's history included a sickle cell trait, iron deficiency anemia and hemoglobinopathy. The minor's weight fluctuations, as recorded within the medical records, were as follows:
8/21/2014 - 20 pounds, 1 ounce
10/19/2014- 21 pounds, 6.2 ounces
12/10/2014 - 22 pounds, 7 ounces
1/31/2015 - 23 pounds, 2.4 ounces
4/16/2015 - 20 pounds, 12 ounces
4/22/2015 - 20 pounds, 15.1 ounces
4/27/2015 - 21 pounds, 14.3 ounces
4/29/2015 - 22 pounds, 4 ounces
8/22/2015 - 24 pounds, 4 ounces
9/18/2015 - 23 pounds, 6.4 ounces
11/13/2015 - 23 pounds, 5.9 ounces
12/18/2015 - 23 pounds, 13 ounces
12/24/2015 - 24 pounds, 7.5 ounces
1/26/2016 - 24 pounds, 14.6 ounces
¶ 45 The hospital notes for the November 13, 2015, visit indicate that respondent was present while the foster parent was not. In the notes, Dr. Patton stated that "[the minor was] visibly content in the presence of his father." Dr. Patton's records further noted that she had not personally met the minor's foster parent because she had not accompanied him to either visit and she was a "no-show" for an October 2015 appointment. After the lab results were obtained, Dr. Patton left a voice message for the foster parent but did not receive a call back. On December 18, 2015, both respondent and the foster parent were present, at which time Dr. Patton recommended that the minor be readmitted to the hospital to rule out other health issues and to obtain a second failure to thrive evaluation. The notes continued, "foster mom and biological father do not speak, so they do not communicate regarding what the other has fed [the minor] during the day and shift changes. [The minor] has 3, unsupervised visits with dad 6 hr visits for a total of 18hrs/wk." The test results were negative and the poor weight gain was due to insufficient calories. The notes also indicated that the inconsistent weight gain and recent fall in weight raised concerns about the adequacy of food available during visits with respondent.
¶ 46 Respondent objected to the admission of some of the documents on the ground that he never received them; however, the State provided a certified mail green card as proof that they sent the documents to him. The State also noted that respondent's previous counsel, attorney Torres, tendered her entire file to respondent when her appointment was vacated. The court admitted the documents provisionally but set another court date to allow respondent time to review them. The court also again suggested that respondent accept appointed counsel, which respondent refused.
¶ 47 At a subsequent court date of October 20, 2016, where respondent again appeared pro se , the State's documents were admitted into evidence. The matter was set for a later date due to the attorney for the minor's natural mother being on medical *342 *538 leave. On January 4, 2017, respondent was incarcerated and not present, although he had been writ in from Cook County Jail. Lieutenant Brent Martin of the Cook County Department of Corrections, testified under oath via telephone that respondent refused to board the bus to court because he did not want the other inmates to know of his personal business. Martin knew that respondent would be "combative," so they would need another unit to pick up respondent to attend court on another day. The circuit court issued an order continuing the matter to another day when respondent could be present.
¶ 48 On the subsequent date, respondent was not present, and the courtroom deputy indicated that respondent refused to come. The matter then proceeded to closing argument for the adjudication hearing.
¶ 49 After argument, the court found that the minor was neglected and abused based on the unrebutted testimony of Dr. Glick that he was malnourished as well as his failure to gain weight due to a non-organic failure to thrive. The court noted that when the minor was in the hospital, he gained weight. The court found the minor abused or neglected based on a lack of care ( 705 ILCS 405/2-3(1)(a) (West 2016) ), injurious environment ( 705 ILCS 405/2-3(1)(b) (West 2016) ), and a substantial risk of physical injury ( 705 ILCS 405/2-3(2)(ii) (West 2016) ).
¶ 50 G. Dispositional Hearing
¶ 51 A dispositional hearing commenced on January 13, 2017, in respondent's absence. The integrative assessment and service plan and court report were entered into evidence.
¶ 52 Langdon testified that play therapy was recommended to stabilize the minor's aggressive behavior and he was on a waiting list at LaRabida for services. The minor was also scheduled to receive an evaluation at Children's Research Triangle. He attended a half-day, pre-Kindergarten daycare program and still received an appetite stimulant. The minor weighed 28 pounds at the time of the hearing.
¶ 53 Langdon further testified that respondent was incarcerated and still needed individual therapy, domestic violence perpetrator services, substance abuse services, and continued parenting classes and coaching, but had completed the integrated assessment and participated in visitation. He also completed substance abuse treatment in March 2016, but self-reported that he relapsed. Respondent had not complied with follow-up drug tests.
¶ 54 At the close of the hearing, the circuit court adjudicated the minor a ward of the court and further found respondent unable only to parent him. A DCFS administrator was appointed as the minor's guardian. Respondent's timely appeal of both the adjudication and dispositional decisions followed.
¶ 55 II. ANALYSIS
¶ 56 On appeal, respondent contends that: (1) the circuit court erred in not appointing counsel after vacating the initial appointment of attorney Torres prior to the adjudication and dispositional hearings; and (2) the circuit court's finding of abuse and neglect based on failure to thrive was against the manifest weight of the evidence.
¶ 57 A. Waiver
¶ 58 As an initial matter, we address the State's contention that respondent's issue concerning the circuit court's vacatur of the appointment of counsel is waived because he failed to object at any time during or after the hearings and because he acquiesced in the court's conduct.
¶ 59 A review of the record reveals that respondent did not object to the *343 *539 court vacating attorney Torres's a appointment with her agreement, and raises this issue for the first time on appeal. Failure to raise an objection at trial or during post-trial proceedings results in waiver of the right to raise the issue on appeal. Limanowski v. Ashland Oil Co., Inc. , 275 Ill. App. 3d 115, 118, 211 Ill.Dec. 666, 655 N.E.2d 1049 (1995). It is well-settled that the rules of waiver and forfeiture are limitations on the parties and not the courts. In re Madison H. , 215 Ill. 2d 364, 371, 294 Ill.Dec. 86, 830 N.E.2d 498 (2005) ; In re Marriage of Sutton , 136 Ill. 2d 441, 445, 145 Ill.Dec. 890, 557 N.E.2d 869 (1990) ; In re Darius G. , 406 Ill. App. 3d 727, 732, 346 Ill.Dec. 634, 941 N.E.2d 192 (2010). Our concern for reaching a just result may override considerations of waiver. In re Timpone , 208 Ill. 2d 371, 382, 281 Ill.Dec. 595, 804 N.E.2d 560 (2004).
¶ 60 We agree with the State that respondent would normally waive consideration of this issue by failing to object during the proceedings below and by raising it for the first time on appeal. In re Brandon , 395 Ill. App. 3d 224, 233, 334 Ill.Dec. 250, 916 N.E.2d 890 (2009). However, there is no doubt that the right of a parent to control the upbringing of his or her children is a fundamental constitutional right. In re D.W. , 214 Ill. 2d 289, 310, 292 Ill.Dec. 937, 827 N.E.2d 466 (2005). See also Troxel v. Granville , 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 56 (2000) ; Skinner v. Oklahoma ex rel. Williamson , 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942). Under the circumstances presented by this case, where the well-being of a child and parental rights are at issue, we elect not to apply the rule of waiver and will consider the issue on its merits. Madison H. , 215 Ill. 2d at 371, 294 Ill.Dec. 86, 830 N.E.2d 498.
¶ 61 B. Vacatur of Counsel's Appointment
¶ 62 Respondent first contends that the circuit court abused its discretion in vacating the appointment of his court-appointed counsel prior to the adjudication hearing. Specifically, respondent argues that his court-appointed counsel improperly filed a motion to withdraw, which poisoned the relationship between counsel and he, and the circuit court erred in allowing him to proceed pro se because there was no valid reason to vacate the appointment and counsel's withdrawal had a material, adverse effect on respondent's interests, namely the unchallenged introduction of Dr. Glick's testimony.
¶ 63 Although there is no constitutional right to counsel in proceedings pursuant to the Juvenile Court Act (705 ILCS 405/1 et. seq. (West 2014) ), a statutory right is granted under the Act. In re Charles W. , 2014 IL App (1st) 131281, ¶ 32, 379 Ill.Dec. 322, 6 N.E.3d 399. "When [the] Illinois legislature enacted the Juvenile Court Act of 1987, it provided that the parent of a minor who is the subject of proceedings under the Act will be provided with the assistance of court-appointed counsel if the parent is financially unable to employ counsel." In re Adoption of K.L.P. , 198 Ill. 2d 448, 461, 261 Ill.Dec. 492, 763 N.E.2d 741 (2002). See also 705 ILCS 405/1-5 (West 2014). The statute provides that the appointed counsel must appear at all stages of the proceedings, and the appointment shall continue through the permanency review hearings and termination of parental rights proceedings, "subject to withdrawal or substitution pursuant to Supreme Court Rules or the Code of Civil Procedure." 705 ILCS 405/1-5(1) (West 2014).
¶ 64 Supreme Court Rule 13 (eff. July 1, 2013) governs the withdrawal of attorneys. It specifies the procedures an attorney *344 *540 must follow before the trial court will grant his or her leave to withdraw an appearance for a party. Ill. S. Ct. R. 13(c). Counsel must, among other things, submit a written motion to withdraw and provide notice to the represented party by personal service or certified mail. Ill. S. Ct. R. 13(c)(2). The motion may be denied by the court if the granting of it would delay the trial of the case, or would otherwise be inequitable. Ill. S. Ct. R. 13(c)(3).
¶ 65 Here, the record reveals that the circuit court appointed counsel for respondent on May 4, 2015. The record further reveals that attorney Torres first filed a written motion to withdraw as respondent's counsel on September 29, 2015. According to the motion, respondent was notified by letter of the motion which advised him that he had 21 days from the date of the withdrawal to find other counsel or enter a supplemental appearance. On November 10, 2015, counsel's motion was withdrawn and her representation of respondent continued.
¶ 66 However, during an attorney-only conference on December 29, 2015, attorney Torres indicated to the court that respondent was upset and reminded the court that she had previously tried to withdraw from the representation. The court indicated that it would not grant a request for withdrawal at that point. When the hearing resumed, respondent indicated that he wished to have another attorney, but after being faced with a continuance, he relented to attorney Torres's continued representation.
¶ 67 At a subsequent attorney-only conference on January 29, 2016, attorney Torres indicated that respondent had called her several times and that he did not want her to represent him. According to attorney Torres, respondent told her that she was not his attorney. However, when attorney Torres checked the court records, no other attorney had filed an appearance on respondent's behalf. Later, during the hearing, respondent questioned why attorney Torres was there and stated that he did not want her representation. He also stated that he did not have another attorney. Attorney Torres stated that she did not object to vacating her appointment from the case, and the circuit court vacated its appointment of counsel in a written order prepared by attorney Torres. The written order stated that the appointment was vacated on the "oral motion" of counsel. The circuit court then continued with the hearing.
¶ 68 The record further indicates that during subsequent hearings, the circuit court offered to appoint another attorney for respondent or refer him to a bar attorney and each time he refused the offer and elected to proceed pro se .
¶ 69 Based on our review of the record, we conclude that it was not error for the circuit court to vacate attorney Torres's appointment. While the Act clearly states that counsel is to be provided through all stages of a child adjudication matter, there is no prohibition against a respondent waiving representation by counsel and appearing pro se . See In re Abel C. , 2013 IL App (2d) 130263, ¶ 18, 375 Ill.Dec. 883, 998 N.E.2d 175 ; In re J.R. , 2011 IL App (3d) 100094, ¶ 18, 351 Ill.Dec. 755, 952 N.E.2d 128. Here, the record clearly indicates that respondent did not want attorney Torres to represent him and wished to proceed pro se . Additionally, the record further indicates that respondent turned down subsequent opportunities to be appointed counsel.
¶ 70 Respondent is correct in his assertion that Rule 13 requires a motion for the withdrawal of counsel to be in writing and served on the party. Indeed, Rule 13 also " 'requires a continuance of at least 21 *345 *541 days after the order granting withdrawal so that the party can retain other counsel or enter his or her own supplemental appearance.' " In re Robert S. , 357 Ill. App. 3d 214, 218, 293 Ill.Dec. 589, 828 N.E.2d 899 (2005) (quoting In re Marriage of Miller , 273 Ill. App. 3d 64, 69, 209 Ill.Dec. 856, 652 N.E.2d 396 (1995) ). However, we disagree that Rule 13 applied in this case.
¶ 71 Here, the record is clear that the withdrawal was not initiated by attorney Torres, but was instead initiated by respondent in a phone call when he told her that he no longer wanted her to represent him. Based on that she brought her entire case file to the next court hearing. At the court date prior to withdrawal, respondent stated that he did not want attorney Torres as his attorney. When respondent appeared, he asked why attorney Torres was at the hearing and twice stated that he had "fired" her and that she was no longer his attorney. It was respondent who indicated that he did not want attorney Torres to represent him and that he would represent himself. It was only then that attorney Torres stated that she did not object to her appointment being vacated. The record confirms that attorney Torres did not file another written motion to withdraw, although she did check the record and found there was no other counsel of record. Despite the written order indicating that the appointment was vacated pursuant to appointed counsel's oral motion, the record indicates that the appointment was vacated in accordance with respondent's desire not to be represented by attorney Torres. The circuit court then immediately continued with the hearing, even though respondent stated that he did not have another attorney, after respondent indicated that he wished to represent himself and would leave the courtroom otherwise. At previous hearings, the circuit court admonished respondent that it would not be in his best interests to proceed without counsel, and respondent acquiesced in allowing appointed counsel to represent him. However, at this particular hearing, respondent acknowledged that the court had previously admonished him and that he wished to proceed without counsel.
¶ 72 This situation is analogous to that presented in In re S.W. , 2015 IL App (3d) 140981, ¶ 32, 393 Ill.Dec. 117, 33 N.E.3d 861, where the court held an unfitness hearing after appointing four different attorneys to represent respondent when she expressed dissatisfaction with their representation. The circuit court had continued the hearing twice to allow the fourth court-appointed counsel time to prepare for the hearing, before finally conducting the hearing after respondent fired counsel and requested a 90-day continuance to secure private counsel. S.W. , 2015 IL App (3d) 140981, ¶ 32, 393 Ill.Dec. 117, 33 N.E.3d 861. The court in S.W. ultimately concluded that Rule 13 did not apply because respondent fired the fourth court-appointed counsel; counsel did not seek to withdraw. S.W. , 2015 IL App (3d) 140981, ¶ 33, 393 Ill.Dec. 117, 33 N.E.3d 861. The court also found that the trial court did not abuse its discretion in denying respondent's request for a continuance. S.W. , 2015 IL App (3d) 140981, ¶ 34, 393 Ill.Dec. 117, 33 N.E.3d 861.
¶ 73 Just as the court in S.W. found that Rule 13 did not apply when respondent fired counsel, we reach the same conclusion. In this case, although there was but one court-appointed attorney, the record clearly shows that respondent fired attorney Torres. As noted previously, just as respondent has the right to be represented by counsel, respondent also has the right to proceed without counsel. Abel C. , 2013 IL App (2d) 130263, ¶ 18, 375 Ill.Dec. 883, 998 N.E.2d 175. After electing to proceed pro se , respondent turned down multiple opportunities to again be appointed counsel *542 *346 and did not retain private counsel. See Abel C. , 2013 IL App (2d) 130263, ¶ 19, 375 Ill.Dec. 883, 998 N.E.2d 175. "Neither the statute nor judicial precedents specify how many times a trial court must appoint counsel in the event that counsel withdraws or an indigent parent no longer desires their particular services." In re Travarius O. , 343 Ill. App. 3d 844, 851, 278 Ill.Dec. 792, 799 N.E.2d 510 (2003). Here the record shows that the circuit court subsequently offered respondent the services of court-appointed counsel at later hearing dates after counsel's appointment was vacated and respondent refused. We therefore conclude that Rule 13 did not apply and that respondent's argument is without merit. Accordingly, the trial court did not abuse its discretion in vacating the appointment of respondent's counsel and proceeding with the hearing.
¶ 74 D. Findings of Abuse and Neglect
¶ 75 We now turn to respondent's contention that the circuit court's finding of abuse and neglect based on failure to thrive was against the manifest weight of the evidence.
¶ 76 Respondent contends that Dr. Glick's opinions that the lack of collaboration between respondent and the foster parent around respondent's unsupervised visits resulted in inconsistencies and inadequate calories; that the minor experienced weight loss after respondent was granted unsupervised visits; that respondent did not accept Comer's diagnosis of the minor as malnourishment and was adversarial with the staff; that respondent was not providing the minor with adequate caloric intake; that respondent's refusal to learn how to take care of the minor concerned her about his ability to take care of the minor; and that respondent's inability to collaborate with the foster parent resulted in a less than optimal plan between the two caretakers was based on incorrect information. Specifically, he argues that Dr. Glick had incorrect information regarding when respondent began unsupervised visits; the daycare arrangement; the lack of coordination between the medical providers, agency workers, foster parent, daycare providers and respondent; and the unchallenged evidence that the minor gained measurable weight only when he was placed on an appetite stimulant. Respondent also alleges that Dr. Glick disregarded the time periods when the minor failed to gain any weight while in foster care. Respondent further contends that the circuit court disregarded its long-held "opinion" based on testimony at pre-adjudication hearings that the daycare facility was not spending the time needed to ensure the minor received adequate nutrition. Respondent concludes that, given the discrepancy between the history of the case and Dr. Glick's presumptions, the circuit court's finding of neglect and abuse based on Dr. Glick's unrebutted testimony is against the manifest weight of the evidence.
¶ 77 The process of determining whether a child should be removed from his parents and made a ward of the court is prescribed by the Juvenile Court Act of 1987. 705 ILCS 405/1 et seq . (West 2018). Where a petition for adjudication of wardship is filed by the State, the Act provides that a temporary custody hearing shall be held during which the court shall determine whether there is probable cause to believe the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate the necessity of removal. 705 ILCS 405/2-10 (West 2018). Each finding must be made in writing. 705 ILCS 405/2-10 (West 2018).
*347 *543 ¶ 78 Following a child's placement in temporary custody, the court must make a finding of abuse, neglect or dependence before it conducts an adjudication of wardship. 705 ILCS 405/2-21 (West 2018). In determining whether a child is neglected, the State must prove the allegations of neglect by a preponderance of the evidence. In re Edward T. , 343 Ill. App. 3d 778, 794, 278 Ill.Dec. 586, 799 N.E.2d 304 (2003). A trial court's ruling regarding neglect or abuse will not be disturbed unless it is against the manifest weight of the evidence. In re Arthur H. , 212 Ill. 2d 441, 463-64, 289 Ill.Dec. 238, 819 N.E.2d 734 (2004). The court's determination is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. Edward T. , 343 Ill. App. 3d at 794, 278 Ill.Dec. 586, 799 N.E.2d 304. Under this standard of review, the reviewing court must give deference to the trial court's findings of fact as the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses, assess their credibility, and weigh the evidence. Edward T. , 343 Ill. App. 3d at 794, 278 Ill.Dec. 586, 799 N.E.2d 304. The term neglect applies to willful as well as unintentional disregard of duty. Arthur H. , 212 Ill. 2d at 463, 289 Ill.Dec. 238, 819 N.E.2d 734.
¶ 79 In this case, the minor was diagnosed with malnourishment and failure to gain weight due to a nonorganic failure to thrive because he was not receiving proper nutrition while in respondent's care. The record indicates that the minor's primary care physician was concerned about his lack of weight gain in April 2015 and suggested hospitalization to address it. Respondent left, and no one was able to find him or the minor for almost a week before the minor was eventually located, placed under the care of DCFS and hospitalized at Comer. Dr. Glick testified that the minor was diagnosed with malnourishment, inadequate caloric intake and lack of "appropriate environmental administration of food." This diagnosis prompted the minor's placement in foster care upon his release from Comer. During the hospitalization, the minor gained weight. While the minor was in foster care, respondent had supervised visits with him and was allowed to feed him. When the minor was admitted to Comer again in November 2015, respondent's description of his eating habits contrasted sharply with observations from the foster parent and hospital staff. Additionally, respondent was observed eating from the minor's plates, which made it difficult for Comer to track the minor's eating. Respondent also told staff that he often fed the minor "on the go" as opposed to the foster parent's structured meal time. During the minor's third hospitalization in December 2015, Comer staff observed respondent being less than engaged with the minor and his feeding. Throughout the various hearings, respondent was unemployed, had a drug dependency issue and was sometimes incarcerated (which was the case at the adjudication and dispositional hearings). These factors support the circuit court's finding that respondent was unable to care for the minor. While respondent is correct that the minor continued to lose weight while in foster care, that fact does not bear on the circuit court's finding that respondent was unable to care for the minor at that time.
¶ 80 Additionally, with respect to respondent's specific contentions regarding Dr. Glick's testimony as the basis for the trial court's findings, we find that respondent's arguments are without merit. The record indicates that respondent left the adjudication hearing after Dr. Glick's testimony, he failed to present contrary evidence to rebut Dr. Glick's uncontradicted testimony, and he failed to appear at the dispositional hearing. Thus the State's evidence, including Dr. Glick's testimony, was the only evidence before the court at both the adjudication and dispositional hearings.
*348 *544 The trial court is in the best position to observe the conduct and demeanor of the witnesses, assess their credibility and weigh the evidence. In re Edward T. , 343 Ill. App. 3d 778, 795, 278 Ill.Dec. 586, 799 N.E.2d 304 (2003). We find no reason to overturn the trial court's findings regarding Dr. Glick's testimony. Edward T. , 343 Ill. App. 3d at 795, 278 Ill.Dec. 586, 799 N.E.2d 304.
¶ 81 We therefore conclude that the circuit court's finding that respondent was unable to care for the minor was not against the manifest weight of the evidence. The circuit court's adjudication and dispositional orders are affirmed.
¶ 82 III. CONCLUSION
¶ 83 For the foregoing reasons, we affirm the judgment of the circuit court.
Affirmed.
Presiding Justice Rochford and Justice Lampkin concurred in the judgment and opinion.

Respondent was awarded custody of the minor on February 11, 2015. The minor's natural mother, who is not a party to this appeal, was added to the proceedings at some point and was subsequently found to be unfit and unable to care for the minor.

This term is not defined in the record.

The term CIPP is undefined in the order.