2021 IL App (2d) 200548-U
No. 2-20-0548
Order filed January 8, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re K.M., J.M., and A.M., Minors, | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | |
| | ) | Nos.   19-JA-518 |
| | ) | 19-JA-519 |
| | ) | 19-JA-520 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Francis M. Martinez, |
| Appellee, v. Christina C., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's determinations that respondent is unfit or unable to care for the minors, the minors be declared wards of the court, and the father be granted custody and guardianship of the minors are affirmed.

¶ 2    Respondent, Christina C., appeals from the judgment of the circuit court of Winnebago County adjudicating her children, K.M. and J.M., neglected minors pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2018)) and her child, A.M., a neglected and abused minor pursuant to sections 2-3(1)(b) and 2-3(2)(ii) of the Act (705 ILCS 405/2-3(1)(b), (2)(ii)(West 2018)); finding her unfit or unable to care for the minors; declaring the

minors wards of the court; and placing custody and guardianship of the minors with their father, Eric M. On appeal, respondent is not challenging the court's adjudication order, but she is challenging the court's finding that she is unfit or unable to care for the minors as well as the ultimate dispositional order. For the following reasons, we affirm.

¶ 3                                 I. BACKGROUND

¶ 4      Respondent and Eric were married in 2009. Three children were born of their relationship, A.M. in July 2005, J.M. in February 2011, and K.M. in April 2013. In September 2016, Eric filed a petition for dissolution of marriage. Judgment for dissolution was entered in May 2018 wherein Eric received majority parenting time with A.M. and respondent received majority parenting time with J.M. and K.M. In September 2019, respondent married Dustin C., whom she had been in a relationship with since August 2016. In October 2019, the trial court granted Eric's motion for change in custody. Eric received majority parenting time with all three children, respondent was granted weekly supervised visitation, and Dustin was not allowed contact with the minors. This change was granted because of a then-pending investigation by the Department of Children and Family Services (DCFS) into allegations that Dustin had punched respondent in the face in the presence of the minors. After that DCFS investigation was dismissed, the custody order was later modified to allow respondent unsupervised visitation and removing the no-contact order with Dustin.

¶ 5      The incident that led to the neglect petitions being filed in this case occurred on November 7, 2019, at the residence of Peggy C., respondent's mother, during a supervised visitation between the respondent and the minors. After intervening in an argument between A.M. and his half-brother, C.R., respondent struck A.M. on the face.

¶ 6        On November 26, 2019, Eric filed petitions for findings of neglect by respondent of all three children.  On February 11, 2020, the State filed amended neglect petitions.  The two-count petition filed on A.M.'s behalf alleged that his mother struck him with her hand leaving a handprint on his face; therefore, he was (1) a neglected minor and his environment is injurious to his welfare (705 ILCS 405/2-3(1)(b) (West 2018)) and (2) an abused minor because his mother inflicted and created a substantial risk of physical injury which would likely cause him harm (705 ILCS 405/2-3(2)(ii)(West 2018)).  The one-count petitions filed on behalf of K.M. and J.M. alleged they were neglected minors because their environment was injurious to their welfare in that their mother struck the minors' sibling with her hand leaving a handprint on the sibling's face, thereby placing K.M. and J.M. at risk of harm. 705 ILCS 405/2-3(1)(b) (West 2018).

¶ 7        On April 28, 2020, the circuit court conducted shelter care proceedings for the minors.  Eric was granted temporary custody and guardianship.  Respondent was granted visitation with the children every Tuesday and Thursday from 4 p.m. until 8 p.m. and every other weekend from Friday at 4 p.m. until Sunday at 8 p.m.  Among other things, the court ordered that there be no contact between the minors and Dustin.  All parties were ordered to remain drug and alcohol free and submit to random drug tests; engage in any services and assessments directed by DFCS related to parenting, substance abuse, domestic violence, and any other issues the court or DCFS requests to be addressed; and cooperate with the caseworker, complying with any service requests and allowing him into the residence to speak to the minors.

¶ 8        The adjudication hearing was held on July 17, 2020.  All parties were present and represented by counsel.

¶ 9        Eric testified that the three minors live with him and his fiancé in Machesney Park, Illinois. On November 7, 2019, he took the minors to Peggy's house for a scheduled supervised visit with

respondent. Approximately 30 minutes later, A.M. came home upset and stated that respondent had struck him in the face. A.M. told Eric that he had been arguing with his younger brother and respondent stepped in, called him names, and struck him. Eric observed a red handprint on the side of A.M.'s face and took a photo of it with his cell phone. The photo was admitted into evidence. Eric called the police who arrived a few minutes later to take a report. Eric described that he has had a difficult relationship with respondent since their separation. He testified that this was not the first time A.M. had told him that respondent had hit him. He testified that he was unaware that A.M. had called his mother an expletive or that A.M. had spit at his mother. He stated that respondent did not want custody of A.M. because he was too much for her to handle. Eric stated that respondent no longer sees A.M.

¶ 10     Eric testified further that he has an older son, Seth, who is now an adult. When he was a minor, Seth was removed from the home because of abuse by respondent. Eric decided to stay with respondent, and Seth went to live with Eric's mother. After Seth left to live with his grandmother, Eric stated that respondent began getting physically abusive with A.M. This started when he was about 10 years old. Eric testified that he witnessed respondent strike A.M. in the face, call him names, pull on his ears as a form of punishment, and tell him she wished he had never been born. He testified that he had never seen respondent strike K.M. or J.M.

¶ 11     Eric testified that respondent had another child, C.R., with a different man during the course of their marriage. Eric said that he basically raised C.R. and C.R. participated in the visitation schedule along with the other children. This continued until the fall of 2019, when C.R. left the home to live with his biological father after C.R.'s father had sought custody due to allegations of abuse between respondent and Dustin.

¶ 12    Eric acknowledged an incident occurred in December 2019 where the police were called to his home because he was accused of slapping A.M. He explained that A.M. was "being a little terror" so he started spanking him on the behind as he was lying on a bed. When A.M. turned around, Eric accidentally struck him on the face. Eric testified that he immediately stopped and apologized to his son. Eric denied ever throwing things in anger. A DCFS indicated packet reporting the investigation into this incident and deeming abuse allegations unfounded was admitted into evidence.

¶ 13    A.M. testified that he is a 15-year-old high school student. On the day in November when he was visiting respondent at his grandmother's home, he got into an argument with his 12-year-old brother, C.R., in the living room. He explained that he and C.R. started pushing each other. Respondent came over, pushed A.M. and grabbed him by the upper arms. A.M. and respondent were calling each other names, and then respondent slapped him. He testified that she held onto him and dragged him, but he got out of her grip and left the house. As he was leaving, respondent was yelling that she was going to call the police to report him as a runaway. A.M. said that he ran down the street and called his dad, who picked him up and took him home. His grandmother and younger siblings were there when the incident happened.

¶ 14    A.M. described respondent as "violent." He testified that he has been grabbed by the neck, hit with a belt, and struck by respondent on numerous occasions. Many times, he did not tell anyone because he believed he would get into more trouble for doing so. He said he has talked to the police or DCFS 20 times. A.M. testified that respondent calls him worthless, a waste of air, and she says she hates him and wishes she never had him. He described a school project he completed called "About Me" wherein he was required to write about his life. He described his relationship with respondent as "not good" because she does not want him around, calls him

worthless, and does not like him. The written assignment was admitted into evidence by the guardian *ad litem* (GAL). In it, A.M. wrote that he chose to live with his dad because it was better at his house, he was nicer, and respondent was always mad at him. He wrote that respondent would make him feel bad by calling him names, saying he was a mistake, and hitting him.

¶ 15     A.M. stated that he observed respondent treating Seth the same way before he left the home and that "it was worse" for Seth. Once Seth left, respondent began being abusive to him. A.M. was concerned that after he left respondent's home, respondent would abuse J.M. A.M. said he has also seen respondent slap all of his siblings. When asked when he had seen this, his response was "basically my whole life." When A.M. left to live with his dad, respondent began being abusive to C.R. He had seen respondent hit C.R. with a guitar strap and a belt. A.M. explained that C.R. then went to live with his dad, and soon after K.M. and J.M. began living with Eric.

¶ 16     A.M. said that respondent and Dustin argue and physically fight. He said it bothers him to witness their altercations and that he is particularly concerned about his younger siblings "because they don't need to grow up showing hitting women is right."

¶ 17     Nolen Nimmers testified that he had been the intact caseworker on this matter since January 2020. He had visited the respondent's residence six to eight times, approximately once or twice a month, and three of the visits were unannounced. He observed the minors were safe and looked healthy. The minors have not confided any information about being abused. The minors report being safe at both respondent's and Eric's homes. He knew about the no-contact order against Dustin and had not seen Dustin around the minors. However, he did note that Eric and A.M. both reported to him that Dustin had been around the minors contrary to the no-contact order. He did not know how many times DCFS has investigated reports against respondent.

¶ 18    Peggy is respondent's mother and grandmother to the minors. She has 10 children of her own, 4 of whom are minors who live with her. She lives two or three blocks from Eric and five or six blocks from respondent. On the afternoon of the incident, she and the children were sitting at a table drawing. A.M. began to criticize C.R.'s work, and they began arguing. Peggy told them to stop, but it continued. She told A.M. to leave the table, and he went upstairs where Peggy's children were and began arguing with them. Peggy went upstairs to tell A.M. to stop, and they both came back downstairs. A.M. began to criticize C.R. again. C.R. flicked a piece of paper at A.M., and A.M. went after him. Peggy testified that as A.M. was following C.R. around the table, respondent intervened, grabbing A.M. so he could not get to C.R. Respondent grabbed him around the waist and as he was trying to get away, they fell to the floor. A.M. got up and spit in respondent's face, called her an expletive, said "I cannot believe you just slapped me," and left the house. Peggy said respondent did not slap him. Peggy told respondent to call the police. She had never seen respondent strike any of her children or Dustin.

¶ 19    Dustin testified that he is respondent's husband and stepfather to her children. He testified that he has past convictions for domestic battery, burglary, and most recently a 2018 conviction for aggravated fleeing. He is not currently on probation or facing any criminal charges. He testified that he has been in a relationship with respondent since 2016 and they married in September 2019. He stated that he and respondent never engaged in any physical altercations, but they have had verbal disagreements. He has observed respondent with her children and has never seen her strike any of them. She would discipline by grounding them, removing privileges, or otherwise correcting their behavior.

¶ 20    Respondent testified as to the events on November 7. She testified that she, all four of her children, and her mother were sitting at the table doing a craft. She and K.M. went into the living

room to talk. Soon after, she heard her mother telling A.M. to stop multiple times. She said she was just listening because she thought her mother had it under control. Then she heard C.R. crying. She testified that she saw A.M. had pushed C.R. and Peggy was yelling at him to stop. A.M. then left and went upstairs. C.R. was upset because A.M. was telling him he was stupid and saying other derogatory things about him. Respondent heard A.M. upstairs arguing with her siblings (who are about the same age as A.M.). Peggy went upstairs and was yelling at A.M. to come downstairs and calm down. When A.M. came downstairs, C.R. threw a small toy towards him and A.M. ran towards C.R. calling him names and making derogatory comments about him.

¶ 21   Respondent testified that A.M. pursued C.R. around a table in the living room and she was telling him to calm down. Respondent said she ran towards them and grabbed A.M. around the waist and pulled him backwards. She and A.M. fell to the floor. Respondent testified that A.M. turned around, spit in her face, called her an expletive, and ran outside. She asked him to come back, but he refused. She called the police because she was concerned that if something happened to him, she would be in trouble. The police arrived a few minutes later. Respondent explained that when she put her arms around A.M. it was her intention to control him physically. She has gotten physical with A.M. to control him but not to harm him. She stated that this occurs when he is attacking J.M. or C.R. Respondent testified that A.M. stays with his dad because she cannot physically control him.

¶ 22   Respondent denied ever slapping A.M. or any of her children. She testified that she does not even spank them and has never used any form of corporal punishment. She said that A.M. calls C.R. worthless and stupid and says he wishes he had never been born. She denied ever saying to A.M. that he is worthless and stupid or that she wished he had never been born, but she claimed that A.M. says those things to C.R.

¶ 23   Respondent acknowledged having verbal arguments with Dustin, but never any physical altercations. The police have been called numerous times to her residence, and DCFS has come to her home on around seven occasions, excluding caseworker visits. She acknowledged there was a DCFS investigation regarding C.R. instigated by his biological father, but C.R. decided to go live with his dad about a month and a half before that case was concluded as unfounded.

¶ 24   The court also took judicial notice of the DCFS indicated packet which involved an allegation that in January 2020, Eric had slapped A.M., broken his phone, and thrown a chair in anger. The conclusion of this report was that the allegations were unfounded. In this report, the children indicated that their dad yells, but does not use physical punishment. The court also took judicial notice of a court order dated April 28, 2020, establishing the temporary custody arrangement.

¶ 25   On August 28, 2020, the circuit court found that the State proved all counts in the petitions for neglect by a preponderance of the evidence. In support, the court stated that Eric testified to the initial outcry of A.M. after the incident and took a photo of the injury, which corroborated his testimony. The court determined that A.M. testified credibly and in great detail about the incident with respondent. The court concluded that "The incident itself with [A.M.] speaks for itself and creates an injurious environment." The court then concluded that the same factual bases establishes an injurious environment for K.M. and J.M. under the theory of anticipatory neglect.

¶ 26   After ruling on the adjudication, the circuit court judge allowed the parties to step outside to decide whether to proceed directly to disposition. After a brief recess, the parties returned and decided to move directly to arguments as to the disposition. The GAL asked the court to take judicial notice of the testimony and findings at the adjudicatory phase as well as the exhibit showing A.M.'s school project.

¶ 27    The State argued that guardianship and custody of the minors should remain with Eric and that all parties be ordered to cooperate with DCFS assessments, tests, and counseling. The State further asked that the no-contact order prohibiting Dustin from being around the minors be enforced. Eric's attorney was in accord with the State and specifically requested the court to require DCFS to initiate services to address the problems within the family. The GAL argued that respondent be found unfit, that custody and guardianship be awarded to Eric, and that DCFS continue to provide intact services for the family. The GAL argued that he had "grave concerns" about the history of physical abuse that began with A.M.'s older brother, who was removed from the home, then the abuse of A.M. who had been removed from the home, as well as concern about the domestic violence between respondent and her current husband, Dustin.

¶ 28    Respondent's attorney urged the court to find respondent fit, willing, and able to care for K.M. and J.M. "without necessarily arguing for guardianship and custody of the children to [respondent]." Respondent asked for continued unsupervised overnight visits with K.M. and J.M. and permission to reach out to the children via telephone on the days that she is not visiting with them. She pointed out that "The only concerns that seem to be raised are [respondent's] continued association with her husband, [Dustin], who is not at the home when [respondent] has visits with those children."

¶ 29    The circuit court ruled that Eric was fit, willing, and able to care for the minors, but that he was not absolved of any services that may be deemed necessary for the family. The court further ruled that "until an integrated assessment's done, I cannot find that [respondent] is fit, willing, and able at this point, but that can always change because fitness depends on circumstances at any given time." The court ordered that the minors remain placed with Eric until further order of the

court. All prior orders were to remain in effect, including respondent's unsupervised visitation schedule with the minors and the no-contact order for Dustin.

¶ 30 The court ordered completion of an integrated assessment by DCFS to ascertain what services are necessary for the family. The court also assigned the Court-Appointed Special Advocate (CASA), if resources were available, to provide an additional way to monitor the minors. All parties were ordered to submit to random drug tests at least once a month, cooperate with DCFS and any other agencies monitoring the case, and engage in any services recommended.

¶ 31                                    II. ANALYSIS

¶ 32 On appeal, respondent argues that the trial court erred in: (1) finding her unfit or unable to care for the minors; (2) declaring the minors wards of the court; and (3) failing to make any meaningful factual findings upon which to base its dispositional decision.

¶ 33 As a preliminary matter, we address respondent's implication that it was error for the circuit court to hold the dispositional hearing directly after adjudication and without hearing new evidence, such as additional testimony or agency reports assessing the need for services. Respondent contends, therefore, that the record is devoid of any evidence that the court could have relied upon in making any findings supported by the preponderance of the evidence. We disagree.

¶ 34 The Act requires trial courts to employ a two-step process to decide whether a minor should become a ward of the court. See 705 ILCS 405/2-21 (West 2018). The first step is the adjudicatory hearing where the court must "consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(a) (West 2018). If a child is determined to be abused, neglected or dependent, the trial court moves to step two which is the dispositional hearing. 705 ILCS 405/2-21(2) (West 2018). At this time, the court determines "whether it is in the best interests of the minor and public that he be made a ward of the court, and, if he is to be made a ward of the court,

the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public." 705 ILCS 405/2-22 (West 2018). The Act requires two separate hearings; however, a dispositional hearing may be held immediately following the adjudicatory hearing. *In re Timothy T.*, 343 Ill. App. 3d 1260, 1265-66 (2003). In the instant case, after the trial court held an adjudication hearing and made its findings, it granted a brief recess for the parties to assess moving forward with the case. The court then transitioned directly to the dispositional hearing. Such a procedure is proper as long as there is a "clear line of demarcation" between the two hearings which occurred in this case. *Id.*

¶ 35    Similarly, respondent's contention that the court had no evidence upon which to base its decision at the dispositional hearing is simply incorrect. Although the State did not present additional testimony or other evidence at the dispositional phase, the court did take judicial notice of the testimony and findings from the adjudicatory phase as well as the exhibit showing A.M.'s school project. The Act provides that:

> "In any hearing under this Act, the court may take judicial notice of prior sworn testimony or evidence admitted in prior proceedings involving the same minor if (a) the parties were either represented by counsel at such prior proceedings or the right to counsel was knowingly waived and (b) the taking of judicial notice would not result in admitting hearsay evidence at a hearing where it would otherwise be prohibited." 705 ILCS 405/2-18(6) (West 2018).

In accordance with the Act, all parties were represented by counsel and the court took judicial notice of the testimony and evidence from the adjudicatory proceedings without any objection, thus providing the evidentiary basis for the trial court's dispositional decision.

¶ 36    The trial court's findings at a dispositional hearing involve factual determinations. *In re Abel C.* 2013 IL App (3d) 130263, ¶ 20.  A reviewing court must give great deference to the trial court's findings of fact as it is in the best position to observe the conduct and demeanor of the parties and witnesses, assess their credibility, resolve any conflicts in the testimony, and assign weight to the evidence. *Interest of Davion R.,* 2019 IL App (1st) 170426, ¶ 78.  As such, we will not reverse such decisions unless they are against the manifest weight of the evidence. *In re T.B.,* 215 Ill. App. 3d 1059, 1062 (1991). A finding is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *In re J.C.,* 396 Ill. App. 3d 1050, 1056 (2009).  However, we review the ultimate disposition for an abuse of discretion. *In re Kamesha J.,* 364 Ill. App. 3d 785, 795 (2006).  An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position adopted by the trial court. *In re D.M.,* 2016 IL App (1st) 152608, ¶ 15 (quoting *People v. Taylor,* 2011 IL 110067, ¶ 27).

¶ 37    Respondent argues that the trial court erred in finding her unfit or unable to care for the minors.  We note, however, that respondent did not argue before the trial court that she be deemed fit, willing, and able to care for A.M.  Respondent conceded this issue before the trial court as is established by the following exchange:

> [RESPONDENT'S COUNSEL]:  Thank you, your Honor.  I'll be making a somewhat, I guess, unique argument in a sense that I'll be asking the Court to find that Mother is fit, willing, and able at this time for [K.M.] and [J.M.] without making the same argument for [A.M.].

> THE COURT:  That's not terribly unique.  That seems reasonable. It's a reasonable argument.

[RESPONDENT'S COUNSEL]: Mother has had –

THE COURT: Under the circumstances, from what I understand of the underlying – you know, from the unfitness testimony.

[RESPONDENT'S COUNSEL]: Mother has had and continues to have unsupervised overnight visits with [K.M.] and [J.M.], and there have been no reports or concerns about the health and safety of the minors when they are in the care of Mother. The only concerns that seem to be raised are Mother's continued association with her husband, [Dustin], who is not at the home when Mother has visits with those children. So we're looking for a fitness finding for Mother without –

THE COURT: For two of the children.

[RESPONDENT'S COUNSEL]: For two of the children.

– without necessarily arguing for guardianship and custody of the children to Mother.

We would respect if the Court continues to allow [Eric] to maintain guardianship and custody but Mother also to be found fit."

¶ 38    As to the other two minors, K.M. and J.M., the trial court had ample evidence to conclude that respondent was unfit or unable to care for them due to an injurious environment. An injurious environment is defined by a parent's failure to provide a safe and nurturing shelter for her children. *In re Edward T.,* 343 Ill. App. 3d 778, 797 (2003). The Act provides that in any hearing "proof of abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible." 705 ILCS 405/2-18(3) (West 2018). Under the theory of anticipatory neglect which is based on the concept of "injurious environment" set forth in the Act (705 ILCS 405/2-3(1)(b) (West 2018)), the State

seeks to protect children who have a probability of being subject to neglect or abuse because they reside with an individual who has been found to have neglected or abused another child. *In re Arthur H.,* 212 Ill. 2d 441, 468 (2004). Evidence of abuse or neglect of one minor does not create a presumption of neglect of another, and "such neglect should be measured not only by the circumstances surrounding the sibling, but also by the care and condition of the child in question." *Edward T.,* 343 Ill. App. 3d at 797.

¶ 39    The evidence presented demonstrated that respondent has a history of physical abuse towards A.M. and some of his siblings. A.M. testified about the incident on November 7 that instigated these proceedings when respondent slapped him on the face leaving a handprint. This was corroborated by Eric's testimony and the photo that was taken showing A.M.'s face. A.M. testified that respondent struck him "all the time" and that he had seen respondent slap all of his siblings, and he described instances when C.R. was hit with a guitar strap and a belt. Eric testified that his older son, Seth, was removed from the home when he was a minor as a result of abuse by respondent. Because Eric decided to stay with respondent, Seth was sent to live with his grandmother. A.M. described a pattern of violence that respondent inflicted upon Seth, until Seth was removed from the home, then upon A.M., until he was removed from the home. A.M. expressed concern about J.M. being in danger of the same abuse now that A.M. was out of respondent's home. This pattern of abuse by respondent was of particular concern to the GAL who, having been assigned to A.M. since he was eight or nine years old, was very familiar with the family.

¶ 40    Further, the volatile relationship between respondent and Dustin is a significant cause of concern as it relates to these minors. Dustin testified as to his extensive criminal record, including domestic battery. A.M. testified that he had seen respondent and Dustin physically fight and it

made him concerned for his younger siblings. Respondent's younger child, C.R., who has a different father, left the home to live with his father during the pendency of an investigation into abuse allegations involving respondent and Dustin. Adding to the concerns surrounding these minors is the fact that there is a no-contact order in place which prohibits Dustin from having contact with the minors, as well as evidence that indicates noncompliance with the order. We conclude, therefore, that the trial court's conclusion that it was unable to find respondent fit, willing, and able to care for the children was not against the manifest weight of the evidence.

¶ 41 Next, respondent does *not* argue that it was not in the best interest of the children to be made wards of the court. Instead, she argues that the court "could not assess what was in the best interest of the minors or parents" based upon the lack of evidence before it. We disagree.

¶ 42 The best interest of the child is the paramount consideration at a dispositional hearing in a neglect case. *In re D.S.,* 2018 IL App (3d) 170319, ¶ 13. A trial court cannot make any dispositional order regarding abused or neglected minors without first making them wards of the court. 705 ILCS 405/2-23(1)(a) (West 2018). By making a child a ward of the court, a court can, among other things, keep the case open, oversee the provision of services, and enter any protective orders necessary. *In re K.E.S.,* 2018 IL App (2d) 170907, ¶ 60. In this case, the trial court's decision to deem K.M., J.M., and A.M. wards of the court and thus, retain jurisdiction over the matter did not constitute an abuse of discretion.

¶ 43 As the trial judge noted, A.M. testified in great detail about the abuse he had received and witnessed other siblings receive at the hands of respondent. The GAL expressed particular concern about the pattern of abuse exhibited by respondent. Respondent's volatile relationship with Dustin has resulted in the entry of a no-contact order prohibiting Dustin from being around the children. Furthermore, the report investigating an incident in January 2020 reveals other concerns. Although

the allegations that Eric struck A.M. were deemed unfounded, there are indications that Eric yells and throws things when he is upset. The trial court assessed that there is "dysfunction all the way around" in this family and it was in the best interest of the children that the court continue to oversee the provision of services to the family. Based upon all of the evidence, the trial court's conclusion to declare the minors to be wards of the court was not an abuse of discretion.

¶ 44 Finally, respondent argues that the trial court abused its discretion by failing to make any meaningful factual findings upon which to base its dispositional decision. This contention is without merit.

¶ 45 The Act requires the court to put in writing the factual basis supporting the determinations of whether the parents of a minor adjudged a ward of the court are unfit, unable, or unwilling to care for the minor. 705 ILCS 405/2-27(1) (West 2018). However, our supreme court has held that "an oral finding on the record may satisfy section 2-27(1), provided that it is explicit and advised the parties of the basis for the court's decision." *In re Madison H.,* 215 Ill. 2d 364, 377 (2005).

¶ 46 In this case, the trial judge made oral findings many of which were put into writing in the written order of disposition. The trial judge stated that there was "dysfunction all the way around" in this family. He noted that while the family was participating in intact services, he was concerned that an integrated assessment had not been completed. The judge specifically referenced the no-contact order which prohibited Dustin, who resides with respondent, from contact with the minors. Respondent's attorney acknowledged the court's concern regarding her "continued association with her husband," and explained her solution was to have Dustin not be in the home when the children are present. Based upon the evidence presented, he was unable to find respondent fit, willing and able "at this point." The court determined that Eric was fit, willing, and able to care for the minors and ordered that the current temporary custody order be continued. It was noted

that Eric was participating in family counseling and A.M. in individual counseling. The court was clear that an assessment of services needed by this family must be completed and that all parties must cooperate. He further ordered engagement of the services of CASA to provide another method of assessing the needs of the family. He admonished that the court and DCFS will "keep a tight rein" on this case.

¶ 47     We conclude that the trial court's findings, as stated in open court and those stated in the written disposition order were sufficient to inform the parents of the reasons for the dispositional decision.

¶ 48                                III. CONCLUSION

¶ 49     For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 50     Affirmed.